THE STATE OF OHIO, APPELLEE, *v.* TYLER, APPELLANT.

[Cite as State *v.* Tyler (1990), 50 Ohio St. 3d 24.]

(No. 88-717—Submitted September 12, 1989 — Decided March 28, 1990.)

*John T. Corrigan*, prosecuting attorney, and *Melody A. White*, for appellee.

*Randall M. Dana*, Ohio public defender, *David C. Stebbins, Joann Bour-Stokes, Stephen P. Deffet* and *Bryan Stewart*, for appellant.

*Margery Malkin Koosed*, urging reversal for *amicus curiae*, Ohio Death Penalty Task Force.

*Per Curiam.* R.C. 2929.05(A) requires us to undertake a three-prong analysis of death penalty cases. First, we will review the specific issues raised by appellant with regard to the proceedings below. Second, we will in-

dependently weigh the aggravating circumstances in the case against any factors that mitigate against imposing the death sentence. Third, we will independently consider whether appellant's sentence is disproportionate to the penalty imposed in similar cases.

## I

### Supplemental Instruction

Appellant's first proposition of law deals with a supplemental instruction given the jury during its deliberations in the penalty phase. On the second day of deliberations, the jury asked the trial judge what it should do if it was divided on the question of penalty "and neither group is willing to change * * *." The judge responded with a supplemental instruction conforming to the instruction this court approved in *State* v. *Maupin* (1975), 42 Ohio St. 2d 473, 482, 71 O.O. 2d 485, 490, 330 N.E. 2d 708, 714, at fn. 3.[1]

Appellant advances two arguments on this issue. His first contention is that a supplemental charge urging jurors to attempt to reach a verdict is *per se* improper in the penalty phase of a capital case, because R.C. 2929.03(D)(2) requires that, when a sentencing jury is deadlocked, it must impose a life sentence. However, we rejected that contention in *State* v. *Henderson* (1988), 39 Ohio St. 3d 24, 31-32, 528 N.E. 2d 1237, 1244-1245.

Appellant's second contention is that the charge at issue here was coercive and misstated the law. The trial court instructed: "* * * [S]ince the trial of this case has been expensive in time, effort and money, the Court urges you to make every reasonable effort to agree on a verdict. You may consider that this case must at some

time be decided and that you were selected in the same manner and from the same sources from which any future jury must be selected."

Since the sentencing recommendation must be made by the trial jury, R.C. 2929.03(C)(2)(b), there could have been no retrial of the penalty phase before a different jury in the event of deadlock. See *State* v. *Penix* (1987), 32 Ohio St. 3d 369, 513 N.E. 2d 744. Thus, we agree with appellant's contention that the supplemental instruction was erroneous.

However, the instruction was not coercive. This, we believe, rendered the error harmless. In *Maupin*, we noted that an instruction "that the case must at sometime be decided ***" was "technically inaccurate." We nonetheless regarded it as non-coercive and therefore "nonprejudicial." *Maupin, supra,* at 485, 71 O.O. 2d at 492, 330 N.E. 2d at 716.

The words of *Fulwood* v. *United States* (C.A. D.C. 1966), 369 F. 2d 960 (Burger, J.), which we quoted in *Maupin,* are instructive here as well: "*** The statement that some other jury would have to decide the case if this one could not was accurate as a generality and, in any event, could have had no coercive impact on the jury. If they already knew what would likely happen if they deadlocked, it was surplusage; if they did not know, this information, far from being coercive, would have had the effect of reducing the pressure on them to reach a verdict." *Fulwood, supra,* at 963, quoted in *Maupin, supra,* at 485, 71 O.O. 2d at 492, 330 N.E. 2d at 716.

We have noted above that the instruction at issue here was not accurate, as a "generality" or otherwise.

---

[1] *State* v. *Howard* (1989), 42 Ohio St. 3d 18, 537 N.E. 2d 188, has only prospective effect. As this case was tried well before the announcement of our decision in *Howard,* we do not apply it.

But "in any event" — that is, regardless of its accuracy *vel non* — it "could have had no coercive impact on the jury." Indeed, such a charge would tend to "reduc[e] the pressure * * * to reach a verdict." Cf. *Jones* v. *Norvell* (C.A. 6, 1973), 472 F. 2d 1185 (supplemental charge held coercive because it suggested that retrial to another jury was *not* possible).

Moreover, we note that the instruction here, like that approved in *Maupin*, was directed to all jurors, not just the minority, and instructed the jurors to decide the case only if they could conscientiously do so. See *Maupin, supra*, at 484-485, 71 O.O. 2d at 491, 330 N.E. 2d at 716.

We hold that the supplemental charge was not coercive, and accordingly overrule appellant's first proposition of law.

## II
### Defendant's Refusal to Call Mitigation Witnesses

In appellant's second proposition of law, he argues that the trial court should not have allowed him to withhold mitigating evidence.

As the penalty phase began, appellant's counsel informed the court that he had arranged for five witnesses to testify for appellant. However, appellant instructed his counsel to call no witnesses. Instead, he chose to rely entirely upon his unsworn statement.

In his statement, appellant discussed the evidence of guilt at length and insisted that he was innocent. He told the jury several times that it had "killed" him by convicting him, and that to serve a life sentence "for a murder that I didn't commit" would be as bad as, or worse than, death. For instance, he said:

"* * * But do you honestly feel that I'm guilty?

"If you do, then you have got to come back with a chair verdict. But if you don't, if it is any kindness in your heart at all, then you have got to still give me a death verdict, because life in the penitentiary is death."

Appellant concedes that his counsel were obliged to do as he told them. Nonetheless, he argues that the Eighth Amendment was violated when the trial court took no steps to see that the witnesses testified.

According to appellant, to allow a capital defendant to withhold mitigating evidence from the sentencer defeats "the state's interest in a reliable penalty determination * * *." *People* v. *Deere* (1985), 41 Cal. 3d 353, 364, 222 Cal. Rptr. 13, 20, 710 P. 2d 925, 931. See, also, *State* v. *Koedatich* (1988), 112 N.J. 225, 330-332, 548 A. 2d 939, 993-995. As one commentator has noted, this argument assumes that the state has an "interest in assuring that the death penalty is *not* imposed in cases in which it is permissible but in which it might not have been imposed by a fully informed sentencer." Bonnie, The Dignity of the Condemned (1988), 74 Va. L. Rev. 1363, 1382.

However, "[t]his asserted societal interest is not rooted in the Constitution." *Id.* The individualized consideration of all relevant mitigating factors proffered by the defendant is "a constitutionally indispensable part of inflicting the penalty of death." *Woodson* v. *North Carolina* (1976), 428 U.S. 280, 304 (plurality opinion), quoted in Bonnie, *supra*, at 1382-1383. But this constitutional mandate "derives from the right of the defendant to be treated with dignity as a human being — the foundational value of the eighth amendment." Bonnie, *supra*, at 1383. It does not derive from a "societal interest in promoting leniency or in reducing the number of death sentences * * *." *Id.* at 1383-1384.

That this is so is shown by *Woodson's* identification of the evil to be

avoided by individualized sentencing. A process that does not take mitigating factors into account "treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death." *Woodson, supra.* See, also, *Sumner* v. *Shuman* (1977), 483 U.S. 66, 74-75.

The constitutional requirement that mitigation be considered is not, then, based on any societal interest, but is "rooted solely in a desire to protect the defendant's interests * * *," Bonnie, *supra*, at 1383 — specifically, his interest in not being treated as one of "a faceless, undifferentiated mass." That interest is protected by giving the defendant an opportunity to introduce the mitigating evidence available to him, and requiring the sentencer to consider it. See *People* v. *Silagy* (1984), 101 Ill. 2d 147, 181, 461 N.E. 2d 415, 432. But where he chooses to forgo that opportunity, no societal interest counterbalances his right to control his own defense.[2]

Moreover, we note that the California Supreme Court has recently repudiated *Deere.* "To the extent that *Deere* * * * suggests that failure to present mitigating evidence in and of itself is sufficient to make a death judgment unreliable, it is based on a mistaken understanding of the Eighth Amendment's reliability requirement and its reasoning in that regard is hereby disapproved." *People* v. *Bloom* (1989), 48 Cal. 3d 1194, ___, 259 Cal. Rptr. 669, 690, 774 P. 2d 698, 719, at fn. 9.

Both appellant and *amicus* suggest that *Bloom* applies only to cases where the defendant exercises his right to represent himself, as did the defendant in *Bloom.* We disagree. The entire case against respecting the defendant's choice rests upon the proposition that withholding mitigation makes the sentencing process unreliable. A defendant's self-representation could hardly make an otherwise unreliable death sentence reliable.

In any case, while *Bloom* involved a self-represented defendant, *Deere* did not. It seems to us that, were the suggested distinction valid, the *Bloom* court would have distinguished *Deere* instead of disapproving its reasoning. See *People* v. *Lang* (1989), 49 Cal. 3d 991, ___, 264 Cal. Rptr. 386, 411-413, 782 P. 2d 627, 652-653 (applying *Bloom* to ineffective assistance claim by represented defendant).

---

[2] Professor Bonnie would recognize an independent state interest only "in avoiding death sentences not authorized by law * * *." Bonnie, *supra*, at 1382. That is, the state has an interest in not "executing a person for conduct not legally punishable by death * * *." *Id.* at 1370. However, that interest is fully vindicated where the state has proven the "definitional predicates" for a death sentence — *i.e.,* the elements of the crime and one or more aggravating circumstances.

*Amicus* argues that, in states where a failure to offer any mitigating evidence would require a death sentence, the introduction of such evidence is a necessary "definitional predicate" for a death sentence, citing *id.* at 1387, fn. 66. We disagree. The state's interest is in assuring that no defendant is executed for conduct not punishable by death. *Silagy, supra.* Requiring the introduction of mitigating evidence simply does nothing to further that interest.

In any case, appellant did not completely fail to introduce mitigating evidence. He tried to stir "residual doubts" of guilt, see *State* v. *Gillard* (1988), 40 Ohio St. 3d 226, 234, 533 N.E. 2d 272, 281, and suggested that life imprisonment would punish him more severely than death. Whatever the strategic merits of this course, it did not leave the jury with nothing to weigh against aggravation.

The same value that guarantees a defendant a right to present mitigating evidence — "the right of the defendant to be treated with dignity as a human being," Bonnie, *supra*, at 1383 — also gives him the right to decide what is in his own best interest. In our view, appellant's suggestion that the court call its own witnesses in mitigation or appoint an independent attorney to do so gives insufficient deference to that value.

"* * * [H]owever worthy and highminded the motives of 'next friends' may be, they inevitably run the risk of making the actual defendant a pawn to be manipulated on a chessboard larger than his own case." *Lenhard* v. *Wolff* (1979), 443 U.S. 1306, 1312 (Rehnquist, Circuit Justice, continuing stay of execution), stay denied by full court (1979), 444 U.S. 807, stay denied (1979), 444 U.S. 1301, rehearing denied (1979), 444 U.S. 921. See, also, *Deere, supra*, at 371, 222 Cal. Rptr. at 25, 710 P. 2d at 936 (dissenting opinion).

We find that risk unacceptable. So long as the "definitional predicates" for the death sentence are proven, we believe that the trial court was obliged to honor appellant's choice "out of 'that respect for the individual which is the lifeblood of the law.' " *Faretta* v. *California* (1975), 422 U.S. 806, 834, quoting *Illinois* v. *Allen* (1970), 397 U.S. 337, 350-351 (Brennan, J., concurring). To do otherwise would be "to imprison a man in his privileges and call it the Constitution." *Adams* v. *United States, ex rel. McCann* (1942), 317 U.S. 269, 280. Appellant's second proposition of law is rejected.

In his third proposition of law, appellant argues that, when he refused to let the mitigation witnesses be called, the trial court should have conducted a competency hearing for that reason alone.

In *Hammett* v. *Texas* (1980), 448 U.S. 725, a condemned prisoner was allowed to withdraw his certiorari petition *pro se*, without inquiry into his competence to do so, because his attorney did not question his competence. Cf. *Rees* v. *Peyton* (1966), 384 U.S. 312 (refusing permission for *pro se* withdrawal of petition where petitioner's competence was called into question by psychiatric report).

*Hammett* was relied upon in *Autry* v. *McKaskle* (C.A. 5, 1984), 727 F. 2d 358. In *Autry*, a capital defendant who preferred death to a long prison term refused to let his attorney call witnesses on his behalf in the penalty phase of his trial. The court held:

"[I]n this case any truncation of process or frustration of state required procedures was at most tangential. Instead, in an otherwise hard fought case, Autry refused to allow his counsel to proceed on a tactical course that might have conferred substantial benefit * * *. A competency hearing is not an automatic condition for accepting such decisions." *Autry, supra*, at 362. Accord *People* v. *Guzman* (1988), 45 Cal. 3d 915, 964-965, 248 Cal. Rptr. 467, 497-498, 755 P. 2d 917, 947-948. But, see, Bonnie, *supra*, at 1388-1389.

Thus, even if a capital defendant waives mitigation completely because he wants to be executed, that waiver does not by itself call his competence into question. Cf. *Felde* v. *Blackburn* (C.A. 5, 1986), 795 F. 2d 400, 402 (where defendant had pled insanity and introduced evidence supporting plea, hearing on his competence to waive mitigation may be required); *Hays* v. *Murphy* (C.A. 10, 1981), 663 F. 2d 1004, 1009-1011. Appellant's third proposition of law is overruled.

## III

## Voir Dire

In his ninth proposition of law, appellant contends that prospective juror Melodie Yates was improperly excused

for cause because she opposed capital punishment.

The constitutional standard applicable to the death qualification of jurors in a capital case was stated in *Adams* v. *Texas* (1980), 448 U.S. 38, 45, and reaffirmed in *Wainwright* v. *Witt* (1985), 469 U.S. 412, 424: "[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as juror in accordance with his instructions and his oath." Appellant insists that the stricter standard of *Witherspoon* v. *Illinois* (1968), 391 U.S. 510, 522-523, fn. 21, applies as a matter of state law. See R.C. 2945.25(C). We have, of course, rejected this view. *State* v. *Beuke* (1988), 38 Ohio St. 3d 29, 38, 526 N.E. 2d 274, 284, citing R.C. 2945.25(O). Thus, we apply the *Adams-Witt* standard here.

Yates initially said that she opposed the death penalty but could follow the court's instructions. However, she also stated that she "would like to say clearly absolutely not * * *." She compared imposing the death penalty to "participating in a murder."

Under the prosecutor's questioning, she said that she could fairly consider the death penalty. But she then qualified this response: "The difficult part for me, frankly, *and I do not know the answer to it,* is whether or not I could sign my saying yes to the death penalty." (Emphasis added.)

When the defense questioned Yates, she agreed that she could follow the law, "except for the part that we are talking about." Finally, when the trial court asked her if she could return a verdict of death "assuming that it was proven," she said: "Only with extreme difficulty." When pressed for a more definite answer, she said: "Then I'll just say no. No, I can't."

Yates's answers reflect a juror who originally thought she "might" be able to subordinate her moral convictions to the law of Ohio, but who changed her mind when no longer (as the trial judge put it) "dealing in abstractions." When she considered the prospect of actually signing a recommendation of death, she said: "And as I think about it in that way, I am not sure that what I told you in the beginning was true."

Appellant argues that Yates's later answers should be given little weight because she was intimidated by the prosecutor's searching examination. But even before the prosecutor questioned her, Yates displayed extreme reluctance to impose death, likening it to participating in a murder. Nor does the record show any sign that Yates actually felt intimidated.

The trial judge obviously believed that Yates's later answers reflected her true state of mind. "* * * [D]eference must be paid to the trial judge who sees and hears the juror." *Witt, supra,* at 426. We will not overrule his decision absent an abuse of discretion. *State* v. *Wilson* (1972), 29 Ohio St. 2d 203, 211, 58 O.O. 2d 409, 414, 280 N.E. 2d 915, 920. Finding no abuse of discretion on this record, we reject appellant's ninth proposition of law.

In his tenth proposition of law, appellant argues that the trial court erred by overruling his challenges of five veniremen for cause.

Initially, we note that appellant makes no claim that any of the jurors ultimately seated was less than impartial. He has therefore failed to state a constitutional violation. *State* v. *Broom* (1988), 40 Ohio St. 3d 277, 288, 533 N.E. 2d 682, 695. That said, we turn to his state-law claims.

If the trial court erroneously overrules a challenge for cause, the error is prejudicial only if the accused eliminates the challenged venireman

with a peremptory challenge and exhausts his peremptory challenges before the full jury is seated. *State* v. *Eaton* (1969), 19 Ohio St. 2d 145, 48 O.O. 2d 188, 249 N.E. 2d 897, paragraph one of the syllabus, death penalty vacated (1972), 408 U.S. 935.

A trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion. *State* v. *Wilson, supra.*

Appellant argues that venireman Hozian should have been excluded. Hozian's wife had an elderly aunt who had been assaulted and robbed. Hozian promised to try to be fair to appellant, but said: "It could be difficult * * *." Given Hozian's promise to try to be fair, we cannot find that the trial court's action was arbitrary.

Venireman Patay favored the existence of capital punishment so strongly that she felt "that may be very unfair to the parties." She also believed that courts should "impose harsher sentences," because "[t]here's too many people who you have to be afraid of." Such beliefs are clearly not *per se* cause for challenge. Patay said that she would "probably" not vote automatically for the death penalty, would follow the law, and would have no problem imposing a life sentence if aggravating circumstances did not outweigh mitigating factors.

Moreover, her responses indicated that she had not prejudged the question of penalty. For instance, defense counsel asked her whether she felt the death penalty was "called for" where a defendant was convicted of shooting an "older man" during an aggravated robbery. Pointing out that she knew nothing of appellant's background or the circumstances of the crime, Patay said: "I just can't say yes or no. I don't have an answer." Clearly, the trial

court's decision was supported by substantial testimony.

Venireman Woodard had formed an opinion, based on media accounts of the crime, that appellant was guilty. She had a "fairly strong feeling" that she would not be fair and refused to presume appellant's innocence. The state concedes error, but contends that the error was harmless because the state used one of its own peremptory challenges to remove Woodard from the jury. Thus, the error did not force appellant to choose between accepting Woodard or wasting a peremptory challenge on her. We agree that this rendered the error harmless.

During the process of death qualification, venireman Clutterbuck asked to be excused because he stood to lose substantial income if the trial prevented him from working for "an extended period of time * * *." The trial judge indicated that he was willing to excuse Clutterbuck if neither counsel objected. The defense objected.

During general voir dire, Clutterbuck was "absolutely positive" that his personal concerns would be "a serious problem" that might interfere with his attention to the case. The prosecution moved that Clutterbuck be excused. Again, the defense objected. The defense later challenged Clutterbuck for cause. This challenge was overruled. Having twice objected to excusing Clutterbuck, appellant cannot now complain that Clutterbuck was not excused.

After twelve jurors had been selected, venireman Mlakar was examined on voir dire as a possible alternate juror. Mlakar believed blacks in general to be more inclined than whites to commit crimes. The trial judge denied appellant's challenge for cause and appellant used a peremptory challenge to exclude Mlakar.

Assuming *arguendo* that it was er-

ror to overrule appellant's challenge, no prejudice could have resulted. Appellant used a peremptory challenge to eliminate Mlakar, curing the error. Since no alternates participated in the verdict, appellant cannot claim that he wasted a peremptory challenge on Mlakar that he could have used to eliminate another venireman who sat as a juror. The jury's composition was in no way affected.

For the foregoing reasons, we find appellant's tenth proposition of law to be without merit.

In his eighth proposition of law, appellant argues that the voir dire was improperly conducted in two other respects.

First, he argues that the state should not have asked veniremen if they could consider imposing the death penalty "in this case." We have held such inquiries permissible. *State* v. *Rogers* (1985), 17 Ohio St. 3d 174, 178, 17 OBR 414, 418, 478 N.E. 2d 984, 990, vacated on other grounds (1985), 474 U.S. 1002.

Second, he argues that the state should not have outlined the facts during voir dire. Several veniremen were told that the case was about an elderly man named Sander Leach who sold fruits and vegetables from the back of a van in a parking lot at East 66th Street and Zoeter Avenue, and had been robbed and shot to death. The veniremen were then asked whether they knew anything about these events.

"In the examination of prospective jurors the state has a right to state the nature of an alleged offense and who was claimed to be connected therewith in order to ascertain whether the jurors knew or had read about the occurrence." *Kane* v. *State* (App. 1924), 3 Ohio Law Abs. 246, 246-247. Moreover, the facts stated by the prosecution were essentially uncontested.

Appellant's eighth proposition of law is overruled.

## IV
### Sufficiency of Evidence

In his fifth proposition of law, appellant argues that the conviction was not supported by legally sufficient evidence.

"* * * [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic*.) *Jackson* v. *Virginia* (1979), 443 U.S. 307, 319.

Leroy Head testified that appellant proposed to rob Leach at gunpoint, borrowed a gun and bullets for it, and bought a bag to hide it in. Head saw appellant go into Leach's van, heard two shots, and looked inside to see appellant going through Leach's pockets.

Head further testified that, after returning to Gillis's house, Tyler said that he had "burned" Leach and threatened "more bodies" if anyone talked. Gillis corroborated this testimony.

Appellant argues (in this proposition and in the next) that Head and Gillis were not credible witnesses. But "the weight * * * and the credibility of the witnesses are primarily for the trier of the facts." *State* v. *DeHass* (1967), 10 Ohio St. 2d 230, 39 O.O. 2d 366, 227 N.E. 2d 212, paragraph one of the syllabus. In any case, the details of Head's testimony were corroborated. Judge Parker testified that appellant borrowed six .38 caliber bullets from him. Travick, a clerk at Ferrell's, testified that she sold appellant a paper bag.

Cerafinjos, who lived near the crime scene, heard gunshots and saw a thin man running toward Wade Park.

Amerson saw a man of similar build; five to six minutes later, Amerson saw a shorter, heavier man come around from behind the van and run toward Zoeter Avenue. Appellant, who was shorter than Head, admitted that it had been he who ran toward Zoeter Avenue. This evidence tends to refute appellant's testimony that he began to run when he heard the shots, and it corroborates Head's testimony that he ran first, while appellant stayed to rifle Leach's pockets.

Moreover, appellant's testimony was implausible. He testified that, as he came out of the meat market, he was looking to his right, away from the van, which was to his left. He further testified that, when he heard the first shot, he started to run in an effort to get out of the way. But he ran toward the van — that is, in the direction the shot had come from — even though he had been looking the other way only a moment before. The jury might easily have reasoned that a man trying to avoid gunfire would hardly run toward its source, especially if doing so would have required him to change direction. (Although Tyler claimed that he had been unable to tell where the gunshot noise came from, this claim contradicted the testimony he gave at his original trial, which was brought out on cross-examination.)

It is clear that a rational trier of fact could have found appellant guilty beyond a reasonable doubt of robbing and murdering Leach. We therefore find appellant's fifth proposition of law not well-taken.

In his sixth proposition of law, appellant asks us to find that the verdicts are against the weight of the evidence. But we may weigh evidence only to determine whether it is of sufficient probative force to support a finding of guilt. *State* v. *Nicely* (1989), 39 Ohio St. 3d 147, 155, 529 N.E. 2d 1236, 1243.

Not even in a capital case may we sit as a "thirteenth juror," *Tibbs* v. *Florida* (1982), 457 U.S. 31, 42, as to a judgment of conviction. *State* v. *Cooey* (1989), 46 Ohio St. 3d 20, 26, 544 N.E. 2d 895, 905-906. Having found the evidence of appellant's guilt easily sufficient to support the convictions, we overrule this proposition of law.

In his seventh proposition of law, appellant argues that his conviction based on Head's testimony violated the principle, embodied in R.C. 2923.03 (D), that an accused cannot be convicted solely on the testimony of an accomplice.

In order for the prosecution to satisfy the corroboration requirement of former R.C. 2923.03(D), it must introduce evidence independent of the accomplice's testimony connecting the accused with the alleged crime or identifying him as a guilty actor. *State* v. *Pearson* (1980), 62 Ohio St. 2d 291, 16 O.O. 3d 332, 405 N.E. 2d 296, paragraph two of the syllabus. However, the corroborating evidence need not by itself prove guilt beyond a reasonable doubt. *State* v. *Allsup* (1980), 67 Ohio App. 2d 131, 135-136, 21 O.O. 3d 439, 442, 426 N.E. 2d 499, 503. Moreover, one accomplice may corroborate the testimony of another. *State* v. *Vorys* (1978), 56 Ohio St. 2d 107, 10 O.O. 3d 302, 383 N.E. 2d 115, syllabus.

The testimony of Anthony Gillis provided the required corroboration. Gillis testified that appellant said that he knew where to make some money. Gillis testified that appellant borrowed a gun from him. Gillis further testified that after the murder, appellant said, "I had to burn him * * *." This testimony connected appellant with the robbery-murder of Leach. We must therefore reject appellant's seventh proposition of law.

## V
## Evidentiary Rulings

In his thirteenth proposition of law, appellant argues that it was error for the state to elicit testimony that he had won acquittal in a murder case shortly before the Leach murder.

The prosecutor asked Gillis on redirect examination why Leroy Head confessed to shooting Leach. Gillis replied: "[H]e just told me that Arthur said * * * to tell him that he did it and that he wasn't going to get as much time. He said that if he got it, then he was going to go down, because he just beat a case in Atlantic City, a murder case or something like that."

Appellant argues that the testimony was introduced solely "to show the accused's propensity or inclination to commit crime." *State* v. *Curry* (1975), 43 Ohio St. 2d 66, 68, 72 O.O. 2d 37, 38, 330 N.E. 2d 720, 723. We disagree. The testimony explained why Head would falsely confess to the murder. Appellant's thirteenth proposition of law is without merit.

In his fourteenth proposition of law, appellant argues that the state violated Evid. R. 607 by offering prior inconsistent statements to impeach Head without showing surprise and affirmative damage. During Head's testimony, the state offered two written statements in which Head confessed to shooting Leach. These statements, of course, were inconsistent with Head's testimony.

Appellant argues that the state's use of the prior inconsistent statements on direct examination prejudiced him by taking away his opportunity to "effectively exploit" the inconsistency on cross-examination.

However, Evid. R. 607 is not aimed at that kind of "prejudice." The limitation on the use of prior inconsistent statements "was intended to prevent the circumvention of the hearsay rule," Giannelli, Ohio Rules of Evidence Handbook (2 Ed. 1986) 53. See, also, Staff Note to Evid. R. 607. Head's prior statements, if believed, would have devastated the state's case. The prosecutor clearly did not want the jury to take Head's prior inconsistent statements for the truth of the matter asserted. *Ergo*, he was not trying to circumvent the hearsay rule.

It is clearly permissible for a party to "draw the sting" of cross-examination by bringing out, on direct examination, facts that tend to discredit that party's own witness. See *United States* v. *Frappier* (C.A. 1, 1986), 807 F. 2d 257, 259. This is not done to impeach the witness, but to present an image of candor to the trier of fact. Evid. R. 607 was never intended to limit this practice. There is nothing "intrinsic to the jury's truth-finding function in an arbitrary requirement that opposing counsel's trial strategy may not be undercut." *Bell* v. *State* (Fla. 1986), 491 So. 2d 537, 538.

The state also introduced, on direct examination of Head, a prior statement by Head that was consistent with his testimony. Appellant correctly urges that it was not admissible under Evid. R. 801(D)(1)(b), which permits the use of prior consistent statements to rebut charges of recent fabrication or improper influence or motive. The state concedes error, but contends that the error was harmless. We agree. Given the abundant evidence of appellant's guilt, we conclude beyond a reasonable doubt that the statement had no effect on the outcome of the trial.

Finally, appellant complains that the state asked Head and Gillis a number of leading questions on cross-examination. In our view, appellant has failed to demonstrate that the trial court abused its discretion in allowing

the questions. Appellant's fourteenth proposition of law is not well-taken.

In his fifteenth proposition of law, appellant contends that prejudicial error took place when Cleveland Police Detective James Svekric testified as to his opinion.

As Svekric was testifying about the various statements Head made to him, the prosecutor asked why Head changed his story after admitting that he shot Leach. Svekric said that it was because police had confronted Head with inaccuracies in his first statement. Svekric further testified that Head was "upset" because he had been charged with a capital crime.

The prosecutor asked: "Did Mr. Head ever *inform* you of anything about how he was expected to be treated by the court system * * *?" (Emphasis added.) Svekric replied that Head "expected that he would be able to plead to a lesser included offense * * *" and was surprised when no plea bargain was offered.

The prosecutor asked: "*What was his reaction* to finding out that he was going to trial for a capital offense?" (Emphasis added.) Svekric replied: "Very upset and wanted to know the reasons why. And *we explained to him* that we know that he wasn't telling the whole truth." (Emphasis added.)

We think it clear from the context that Svekric was not speculating as to what Head thought, but was reporting what Head told him.

Appellant also objects to the following testimony by Svekric:

"Q. [Prosecutor] And in your opinion, which one of the two men that ran from the van, that was seen by Susie Amerson, was the one that ran out at East 66th Street?

"MR. RYAN [Defense counsel]: Objection, your Honor.

"THE COURT: Overruled, he may answer that.

"A. [Svekric] Mr. Head.

"* * *

"Q. Who was that heavy man that ran out of the other way of [*sic*] Zoeter?

"A. It was Mr. Tyler. Even in his statement, he admitted he was the one that ran down Zoeter."

This was undoubtedly improper, and the state again concedes error. But appellant admitted that it was he who had run toward Zoeter Avenue — not only in the statement alluded to by Svekric, but in his own testimony at trial. The issue was undisputed. We find beyond a reasonable doubt that this testimony did not contribute to the verdict. Appellant's fifteenth proposition of law is consequently overruled.

In his sixteenth proposition of law, appellant argues that Rosa Leach, the victim's widow, should not have been allowed to testify. Appellant contends that Mrs. Leach offered no relevant testimony, and suggests that the state called her only as a play for sympathy.

We do not agree that Mrs. Leach's testimony was wholly irrelevant. She testified that her husband came home for lunch on the day of the murder and left some money in his room before going back out. This was relevant to explain why, if appellant had tried to rob Leach, he needed to sell Gillis's gun for drug money, instead of using the proceeds of the robbery.

However, Mrs. Leach also testified that her husband had had seven children and that he married her in 1956. This was irrelevant. *Booth* v. *Maryland* (1987), 482 U.S. 496; *State* v. *White* (1968), 15 Ohio St. 2d 146, 151, 44 O.O. 2d 132, 135-136, 239 N.E. 2d 65, 69-70. Moreover, the prosecutor used this information in his penalty phase argument. Cf. *State* v. *Williams* (1988), 38 Ohio St. 3d 346, 354, 528 N.E. 2d 910, 919-920.

But appellant objected neither to

the testimony nor to the prosecutor's reference to it in closing argument. He objected solely to Mrs. Leach being called as a witness, on the ground that she could have nothing relevant to say. But a general objection on grounds of irrelevance, lodged before a single question was asked, could hardly preserve error.

Thus, we apply the plain error rule. In view of the dearth of evidence in mitigation, it is not clear that Mrs. Leach's testimony and the prosecutor's references to Leach's family affected the sentence. Accordingly, we find no plain error, and thus reject appellant's sixteenth proposition of law.

## VI

### Lesser Included Offenses

In his eighteenth proposition of law, appellant argues that the trial court should have charged the jury on lesser included offenses to aggravated murder. However, his request for instructions at trial was not in writing, as Crim. R. 30(A) requires. Therefore we overrule this proposition of law.

In any event, appellant was not entitled to the instructions he requested. At trial he asked for instructions on "murder, * * * manslaughter, and negligible [*sic*] homicide." While appellant did not specify whether he meant voluntary or involuntary manslaughter, he argued that the jury should be instructed on "manslaughter" because of the possible existence of provocation. Thus, we construe his request as one for an instruction on voluntary manslaughter. See R.C. 2903.03.

Murder, under R.C. 2903.02, is any purposeful killing. As such, it is clearly a lesser included offense of aggravated murder under R.C. 2903.01(B). See *State* v. *Thomas* (1988), 40 Ohio St. 3d 213, 215, 533 N.E. 2d 286, 288-289.

However, "even though an offense may be statutorily defined as a lesser included offense of another, a charge on the lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *Thomas, supra,* at 216, 533 N.E. 2d at 289. In other words, the instruction would have been proper in this case only if the jury could reasonably have found that Tyler purposely killed Leach, but not while trying to rob him. The reviewing court must consider the evidence in the light most favorable to the defense. *State* v. *Wilkins* (1980), 64 Ohio St. 2d 382, 388, 18 O.O. 3d 528, 532, 415 N.E. 2d 303, 308.

Leroy Head testified that he saw Tyler going through Leach's pockets after the shooting. Police photographs of Leach's body show what appears to be one of his pockets turned inside out.

Tyler testified that he was never inside the van at all. He testified that he went to East 66th and Zoeter Avenue only to cash the stolen check, and that he heard Head admit shooting Leach.

There was no reasonable view of the evidence on which the jury could have found Tyler guilty of the shooting beyond a reasonable doubt without also finding that Tyler tried to rob Leach. The jury was presented with two "completely divergent stories * * *." *Wilkins, supra,* at 388, 18 O.O. 3d at 532, 415 N.E. 2d at 308. Thus, an instruction on murder would have been improper.

Voluntary manslaughter, R.C. 2903.03, is an inferior degree of aggravated murder, for "its elements are *** contained within the indicted offense, except for one or more additional mitigating elements * * *." *State* v. *Deem* (1988), 40 Ohio St. 3d 205, 209, 533 N.E. 2d 294, 298. Voluntary manslaughter consists of know-

ingly causing the death of another "while under the influence of sudden passion or any sudden fit of rage * * * brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the * * * [offender] into using deadly force * * *." R.C. 2903.03(A).

The element of provocation mitigates the offender's culpability. Cf. *State* v. *Muscatello* (1978), 55 Ohio St. 2d 201, 9 O.O. 3d 148, 378 N.E. 2d 738, paragraph two of the syllabus (under former R.C. 2903.03, "extreme emotional stress" was a mitigating element). And, as the Committee Comment to R.C. 2903.03 points out, "* * * proof of purpose [an element of aggravated murder under R.C. 2903.01 (B)] also constitutes proof of knowledge." See, also, R.C. 2901.22(E). Thus, the elements of voluntary manslaughter are "contained within" those of aggravated murder "except for one or more additional mitigating elements." *Deem, supra.*

As with lesser included offenses, a defendant is entitled to an instruction on an inferior degree of the indicted offense when the evidence is such that a jury could both reasonably acquit him of the indicted offense and convict him of the inferior offense. *Deem, supra,* at 211, 533 N.E. 2d at 299.

When the defendant seeks an instruction on voluntary manslaughter as an inferior degree of aggravated murder, "some evidence of the mitigating circumstance * * * described in R.C. 2903.03 * * *" will satisfy this test and entitle him to the instruction. *Muscatello, supra,* at 204,

9 O.O. 3d at 150, 378 N.E. 2d at 740. Appellant, however, introduced no evidence at all that he was "under the influence of sudden passion or in a sudden fit of rage" when he shot Leach. Nor was there evidence of provocation. An instruction on voluntary manslaughter would therefore have been improper.

Finally, negligent homicide under R.C. 2903.05 consists of "negligently caus[ing] the death of another by means of a deadly weapon or dangerous ordnance * * *." The use of a deadly weapon or dangerous ordnance is not an element of aggravated murder. It is therefore possible to commit aggravated murder without committing negligent homicide.[3]

Nor is negligent homicide an inferior degree of aggravated murder. The "deadly weapon or dangerous ordnance" element of R.C. 2903.05 plainly does not mitigate culpability.

Even had appellant's request been sufficient under Crim. R. 30(A), he was not entitled to the instructions he asked for. We therefore overrule his eighteenth proposition of law.

## VII
### Ineffective Assistance

In his fourth proposition of law, appellant claims that, in several respects, his trial counsel failed to render effective assistance of counsel.

Allegations of ineffective assistance of counsel are subject to a two-pronged test. The defendant must show that, in light of all the circumstances, counsel's representation was professionally unreasonable. *Strickland* v. *Washington* (1984), 466

---

[3] Although similar reasoning was rejected in *State* v. *Banks* (1986), 31 Ohio App. 3d 57, 31 OBR 97, 508 N.E. 2d 986, the *Banks* court seems to have reached this result by also rejecting the "elements test" for lesser included offenses that we adopted in *Wilkins, supra,* and were to reaffirm in *State* v. *Kidder* (1988), 32 Ohio St. 3d 279, 513 N.E. 2d 311. See *Banks, supra,* at 62-63, 31 OBR at 102-103, 508 N.E. 2d at 992-993.

U.S. 668, 690-691. He must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Appellant argues that his attorneys should have objected to the state's asking veniremen on voir dire whether they could impose the death penalty "in this case" if the evidence justified it. As noted above, this was not objectionable.

He claims that his attorneys should have objected when the trial court explained the concept of aggravating circumstances to individual veniremen on voir dire. The trial court said that "aggravating circumstances" were circumstances that would show that an offense was "cruel," "heinious [*sic*]," "particularly terrible," or "very bad." Appellant argues that these attempts to explain the concept of aggravation directed the jury to consider nonstatutory aggravating circumstances.

But these general descriptions were not instructions. The trial court was simply trying to give the veniremen some idea of what the penalty phase of a capital trial is about. The actual instructions given in the penalty phase used none of the phrases appellant complains of; instead, they specified exactly what the sole aggravating circumstance was. We see no basis for objection, and hence no basis for an ineffective-assistance claim.

Appellant argues that his attorneys were ineffective in failing to attend the jury view. Prejudice is presumed when counsel is totally absent from a crucial stage of trial. *United States* v. *Cronic* (1984), 466 U.S. 648, 659, at fn. 25. However, a jury view of a crime scene, in our opinion, is not a crucial stage. See *Snyder* v. *Massachusetts* (1934), 291 U.S. 97, 108-109. Appellant points to no specific, actual prejudice that resulted from counsel's nonattendance.

Appellant further argues that counsel was ineffective in failing to request that the jury view and sidebar conferences be recorded. But without knowing what happened during those portions of the trial, we are obviously in no position to find that it was prejudicial error not to record them.

Appellant argues that his attorneys should have asked for a special instruction that accomplice testimony should be treated with caution, and that they should also have objected to the instruction that accomplice testimony "should be treated the same as [that of] any other witness." But we agree with the court of appeals that the instructions conformed to the law at the time the case was tried.[4] See *State* v. *Scott* (1986), 26 Ohio St. 3d 92, 101, 26 OBR 79, 87, 497 N.E. 2d 55, 63; *State* v. *Flonnory* (1972), 31 Ohio St. 2d 124, 60 O.O. 2d 95, 285 N.E. 2d 726, paragraph four of the syllabus.

Appellee argues that, when he decided not to call witnesses in the penalty phase (see our discussion, *supra,* of appellant's second and third propositions of law), his attorneys should have requested an evaluation of his competence. We note that Professor Bonnie would agree with appellant that "[c]ounsel's failure to do so should be grounds for a finding of ineffective assistance." Bonnie, *supra,* at 1388, fn. 67, citing *Felde* v. *Blackburn, supra,* at 403, fn. 2. However, we hold today that appellant's decision did not

---

[4] R.C. 2923.03(D) now requires that trial courts instruct juries to regard accomplice testimony with "grave suspicion" and "great caution." When this case was tried, this provision had yet to be enacted.

by itself call his competence into question. It follows that counsel was "not * * * constitutionally ineffective for not seeking an inquiry into competency before abiding by * * * [appellant's] decision." *Autry, supra,* at 362. Nor does *Felde* support the contrary position. As we have already noted, in *Felde* the defendant's competence was called into question by his plea of insanity and introduction of supporting evidence.

Appellant also argues that competent counsel would have taken an interlocutory appeal of his decision not to call witnesses in mitigation. However, the case he cites, *State* v. *Hightower* (App. 1986), 214 N.J. Super. 43, 518 A. 2d 482, is inapposite. In *Hightower,* the trial court *ordered* counsel to abide by the client's decision, and the appellate court allowed counsel to challenge that order on interlocutory appeal. Here, there was no order to be appealed. Appellant's counsel acquiesced in his decision, as appellant concedes they should have. (We need not consider whether such an order, had there been one, would have been a final appealable order. See, generally, *Bernbaum* v. *Silverstein* [1980], 62 Ohio St. 2d 445, 447, 16 O.O. 3d 461, 463, 406 N.E. 2d 532, 534.)

Appellant urges that his counsel should have objected to the supplemental charge he complains of in his first proposition of law. Since we hold that the charge was not coercive, we have no basis to find a reasonable probability that, but for counsel's failure to object to it, the result of the proceeding would have been different.

Finally, appellant argues that one of his attorneys failed him by conceding in closing argument during the penalty phase that appellant had participated in robbing Leach.

Despite appellant's consistent denial of any involvement in either the robbery or the murder, his attorney conceded that Head and appellant had plotted to rob Leach. He tried to persuade the jury that appellant had not shot Leach:

"So * * * [appellant] got together with the boy [Head] who Mr. Leach did not know. Mr. Head had that gun. He never gave up that gun. There was plenty of evidence through the trial that showed it. * * *

"Because here's the problem. There is no question Mr. Leach was to be hassled and Mr. Head was to take the money. * * * There was also no question that Arthur Tyler did not have the gun. The gun, it was Mr. Head who went up there and it is very obvious what happened.

"It is a typical situation * * *. You have one person who is trying to watch out and make sure that the other person gets away with the robbery. Suddenly Head, for whatever reason, pulls the trigger."

The defense attorney also said: "Finally, I'm sure that it has to trouble you probably greatly that on that day, Arthur had the audacity to sit up here and tell you he is innocent. Well, in a very strong and convoluted way, he is. * * * [H]e set up a situation that he never expected."

Appellant cites *Brown* v. *Rice* (W.D.N.C. 1988), 693 F. Supp. 381, 396-397, for the proposition that an attorney's penalty phase concession of his client's guilt is ineffective assistance. The *Brown* court thought such a tactic comparable to conceding the defendant's guilt during the trial of guilt or innocence. "[T]he due process clause does not permit the attorney to * * * admit facts that amount to a guilty plea without the client's consent. * * * Similarly, counsel cannot concede to the jury and the state his or her client's guilt during the sentencing phase of a capital murder trial." (Citations omitted.) *Brown, supra,* at 396.

We find this reasoning unper-

suasive.[5] Although the issue of guilt or innocence is relevant to sentencing, see *Lockhart* v. *McCree* (1987), 476 U.S. 162, 181, it is not the only issue in the penalty phase, as it is in the guilt phase. Thus, the consequences of a concession of guilt are worse in the guilt phase — where such a concession amounts to surrender — than in the penalty phase, where a defendant can avoid the death penalty even though the trier of fact does not doubt his guilt at all.

An appeal to residual doubt is unlikely to weigh heavily with a jury that has already found that no reasonable doubt of guilt exists. Furthermore, such a strategy presents its own dangers, as the jury may feel that the defense is questioning its intelligence or integrity. Cf. *State* v. *Johnson* (1986), 24 Ohio St. 3d 87, 90-91, 24 OBR 282, 285, 494 N.E. 2d 1061, 1064. We cannot say that an attorney who rejects such a course acts unreasonably.

Significantly, appellant makes no claim that his attorney's choice of strategy resulted from inadequate investigation. "* * * [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable * * *." *Strickland, supra*, at 690. No doubt counsel would have preferred to discuss the testimony of the five witnesses whom the defense had prepared, but whom appellant had forbidden his attorneys to call.

Even if we thought *Brown* persuasive, we doubt that it applies here. In *Brown*, the defense attorney admitted that his client was guilty of "two horrible crimes" — presumably the murders themselves. *Brown, supra*, at 395. Here, counsel argued that appellant neither killed nor intended to kill. Thus, it cannot be said that he conceded appellant's guilt of the capital offense.

In sum, we think that counsel's argument was a reasonable exercise of professional judgment. Indeed, we find no merit in any of appellant's assertions of ineffective assistance. Appellant's fourth proposition of law is rejected.

## VIII
### Prosecutorial Misconduct

In his eleventh proposition of law, appellant argues that prosecutorial misconduct prejudiced him in both phases of the trial.

During the guilt phase, the prosecutor asserted that he "represent[ed] civilization" and called the jury "the conscience of the community." Appellant urges us to interpret these remarks as an appeal to convict him "for reasons wholly irrelevant to his own guilt or innocence." *United States* v. *Monaghan* (C.A.D.C. 1984), 741 F. 2d 1434, 1441. We do not read them that way, nor do we think it likely that the jury did.

Even were it possible to read the prosecutor's remarks as appellant does, we "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly* v. *DeChristoforo* (1974), 416 U.S. 637, 647.

Even had the prosecutor committed misconduct, it was not objected to. We think these remarks too insignificant to reach the level of plain error.

Appellant argues that the pros-

---

[5] We note that *Brown's* holding in this regard has recently been overruled. *Brown* v. *Dixon* (C.A. 4, 1989), 891 F. 2d 490, 499-500.

ecutor misbehaved in the penalty phase by giving his personal opinion that the death penalty was appropriate. Since the penalty phase of a capital trial "is a moral inquiry into the culpability of the defendant * * *," *California* v. *Brown* (1987), 479 U.S. 538, 545 (O'Connor, J., concurring), it is difficult for prosecutors to argue vigorously for the death penalty without making what might arguably be statements of personal opinion. In any case, we have held that a prosecutor may state his opinion if it is based on the evidence presented at trial. *State* v. *Stephens* (1970), 24 Ohio St. 2d 76, 83, 53 O.O. 2d 182, 186, 263 N.E. 2d 773, 777.

The prosecutor did not insinuate that he knew of evidence outside the record. Indeed, one of the statements specifically ties the prosecutor's opinion to the evidence presented in court: "* * * I feel strongly that he should never be turned loose on the street again for just *the reasons that you saw,* for the reasons the second trial came off again." (Emphasis added.) We do not find the statements improper. In any case, appellant objected to none of them.

Finally, the prosecutor pointed out in the penalty phase that appellant showed no remorse. Appellant urges that he thereby turned the nonexistence of this mitigating factor, cf. *State* v. *Stumpf* (1987), 32 Ohio St. 3d 95, 106, 512 N.E. 2d 598, 609-610, into an aggravating circumstance. *State* v. *DePew* (1988), 38 Ohio St. 3d 276, 289, 528 N.E. 2d 542, 557-558.

Although the prosecutor erred, appellant did not object. Consequently, we apply the plain-error test. Appellant introduced no mitigating factors other than his continued protestations of innocence. It is far from clear that the jury would have found this factor equal in weight to the aggravating circumstance but for the prosecutor's remark. Appellant's eleventh proposition of law is overruled.

IX

Unrecorded Portions of Trial

Despite the command of Crim. R. 22 that "[i]n serious offense cases all proceedings shall be recorded," certain parts of the trial were not recorded. These included the arraignment, the jury view of the crime scene, thirty sidebar conferences, and three pretrial conferences. (We assume, without deciding, that pretrial conferences are "proceedings" that must be recorded under Crim. R. 22.)

Tyler made no effort to correct these omissions in the trial court or the court of appeals. See App. R. 9(C) and 9(E). However, he filed a motion in this court to remand to the court of appeals, or in the alternative to supplement the record. Subsequently, the trial court confirmed that these proceedings had not been recorded. Appellant then renewed his motion to remand. We denied this motion, but granted appellant's motion to supplement the record. *State* v. *Tyler* (1988), 39 Ohio St. 3d 715, 534 N.E. 2d 86. However, no supplementation appears on the record.

In his twelfth and seventeenth propositions of law, appellant argues that the failure to record parts of his trial warrants reversal of his conviction. In his twenty-second proposition of law, appellant asks us to reconsider our decision not to remand to the court of appeals.

Not only did appellant fail to take advantage of App. R. 9(C) or 9(E) in the trial court and court of appeals, he also failed to supplement the record even after we granted his motion to supplement. "In the absence of an attempt to reconstruct the substance of the remarks and demonstrate prej-

udice, the error may be considered waived." *State* v. *Brewer* (1990), 48 Ohio St. 3d 50, 61, 549 N.E. 2d 491, 502. See, also, *State* v. *Osborne* (1976), 49 Ohio St. 2d 135, 142, 3 O.O. 3d 79, 82-83, 359 N.E. 2d 78, 84, vacated on other grounds (1978), 438 U.S. 911. We therefore reject these propositions of law.

## X
### Previously Settled Issues

Appellant's nineteenth, twentieth, and twenty-first propositions of law are summarily overruled on the authority of, respectively, *State* v. *Henderson, supra,* at 28-29, 528 N.E. 2d at 1242-1243; *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 31 OBR 273, 509 N.E. 2d 383, paragraph one of the syllabus; and *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 167-178, 15 OBR 311, 314-324, 473 N.E. 2d 264, 272-281.

## XI
### Independent Review

Finally, we must independently review appellant's sentence for appropriateness and proportionality.

The only mitigating circumstances presented by appellant were his claim of innocence and his argument that life imprisonment would be, for him, as bad as death. We think these considerations are entitled to little weight against the single aggravating circumstance of which appellant stands convicted.

We also find the penalty proportionate to those approved in other cases of robbery-murder. See *State* v. *Clark* (1988), 38 Ohio St. 3d 252, 527 N.E. 2d 844; *State* v. *Post* (1987), 32 Ohio St. 3d 380, 513 N.E. 2d 754; *State* v. *Scott, supra; State* v. *Martin* (1985), 19 Ohio St. 3d 122, 19 OBR 330, 483 N.E. 2d 1157.

Accordingly, appellant's conviction and sentence are affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, WRIGHT, H. BROWN and RESNICK, JJ., concur.

