DAWSON, Appellant,

v.

WOOTEN et al., Appellees.

[Cite as *Dawson v. Wooten* (1992), 82 Ohio App.3d 548.]

Court of Appeals of Ohio,
Licking County.

Nos. 92–CA–49, 92–CA–50.

Decided Nov. 9, 1992.

*Bruce Dawson, pro se.*

*Stephen A. Moyer*, for appellees.

MILLIGAN, Judge.

Appellant Bruce Dawson appeals the judgment of the Licking County Common Pleas Court, awarding appellees Everett E. and Myong O. Wooten, Jr., damages of $50,044 (jury trial), and attorney fees of $11,686.19. Appellant assigns eleven errors; however, both appellant and appellees have briefed these errors as six errors:

"I. Attorney Neel acted with improper and unethical motive in filing a title action on real property under names other than holder of legal title, the party in possession, and real party in interest as unknowing plaintiff Bruce Dawson had neither the desire nor the legal capacity to initiate such action.

"II. The counterplaintiff-appellee and/or his witnesses demonstrate perjured testimony by means of their own evidentiary documents introduced.

"III. Counterplaintiffs have failed to set forth and prove all the necessary and sufficient issues of fact, which if true, could maintain a cause of action in the invasion of privacy.

"IV. The issue of punitive damages should not have been placed before a jury in absence of actual damage and actual malice.

"V. The pretrial, trial, and post-trial conduct of the court demonstrates a clear pattern of the abuse of discretion.

"VI. The judgment entry of the court declaring the Dawson's Trust and all transfers of property into trust as 'a nullity' was done without due process and contrary to law regarding matters of legal title not in issue."

In the late 1970s, appellant, a medical doctor, opened a family practice in Newark. Appellant felt that medical malpractice insurance was too expensive, and that insurance companies settled claims that were unmeritorious. He felt that as a physician he was a target for lawsuits. Appellant therefore did not carry medical malpractice insurance. He decided to conceal his assets so that they could not be traced to him in the event of a lawsuit. Appellant began to transfer his assets into various types of trusts.

Appellant decided to use an alias to further decrease the visibility of his assets. In August 1980, appellee Everett Wooten went to appellant's office for an FAA flight physical. Wooten had similar physical characteristics to appellant, and appellant never expected to see him again.[1] Appellant thus decided to use Everett Wooten as his alias.

Appellant went to the library and found the newspaper clipping which announced Wooten's birth. From the newspaper, appellant obtained the name of Wooten's parents. With this information, he obtained a copy of Wooten's birth certificate.

Appellant took Wooten's birth certificate to a deputy registrar in Columbus, told the deputy that he lost his operator's license, and used the birth certificate to obtain a duplicate of Wooten's license. The license contained all of Wooten's personal information, with appellant's picture.

Appellant then began using Wooten's name and derivatives thereof (using appellee's surname and the initials "E.E.") to transfer property. He acquired the property in his own name, and transferred it into trusts bearing variations of Wooten's name, or of one of appellant's relatives.

After President Reagan was shot, appellant decided to buy a handgun because he was afraid that in the "media hysteria" the Second Amendment (right to keep and bear arms) would be overruled. He wanted a gun because he kept drugs in his office, which was part of his residence. He used Wooten's driver's license to purchase a handgun, because:

"Like I say, if at some future time—as I recall, when Gorbachev went into Lithuania, the first thing he said is everyone has to turn in their gun. Well, at some future time in this country, I thought that might well happen.

"* * *

"And I did not want to have to turn in my gun."

After buying the first handgun, appellant ordered a second. Appellant did not pick up the second gun, because the media attention to the Reagan shooting had died down, and it appeared to him that possession of handguns would continue to be legal. The owner of the gun shop looked up Wooten's phone number in the telephone book, called him, and asked him why he had not picked up his gun. As Everett Wooten had not ordered the gun, he began to suspect that someone had obtained a driver's license in his name.

In 1981, Wooten tried to renew his driver's license and was advised that it had already been renewed. Appellant had renewed Wooten's license before

---

1. The Wootens continued to intermittently see appellant as their family doctor through 1988.

Wooten went to the deputy registrar. The same problem occurred in August 1985, when Wooten attempted to renew his license. In 1985, the Bureau of Motor Vehicles would not issue Wooten a duplicate license, but only a thirty-day permit. During this same time, appellant opened several post office boxes in Pataskala and Alexandria using the false license, to facilitate his concealment of his assets.

During the 1980s, appellee was investigating who had his driver's license. He was concerned that he was being set up for a crime due to the purchase of a handgun registered to his name. He received no assistance from various government agencies he contacted for help.

In 1989, appellant entered Bank One to have his signature (as Everett Wooten) guaranteed. He showed Brenda Evans, a bank employee, Wooten's driver's license. Brenda's husband worked for appellee Everett Wooten. When she asked appellant about her husband, he became defensive and stated that he did not know her husband. Brenda told her husband about the incident, and her husband told appellee. Appellee went to the bank and talked to Brenda about the incident.

Appellee then received a phone call from a man who wanted to purchase property in Utica that was registered in Wooten's name. The man found Wooten's name in the property tax records. The Wootens went to various county offices, and found a property transfer from Bruce and Jacqueline Dawson to a variation of Wooten's name.

Appellee then phoned his mother in Florida giving her Dawson's name, and telling her to give that name to the police if anything happened to him.

Appellees contacted an attorney, the FBI, the Treasury Department, the local police, and the Post Master General, receiving little response. Finally, an agent of the Department of Health and Human Services expressed an interest in helping them.

On April 20, 1989, appellant again entered Bank One to conduct a transaction using appellee's license. After a bank employee confirmed the use of the false identification with appellee, Dawson was arrested by the Newark Police Department.

Appellant pled guilty in federal court to one count of producing false identification. He was sentenced to three years' incarceration, with all but four months suspended, fined $20,000, ordered to perform five hundred hours community service, and placed on probation.

The State Medical Board revoked appellant's license to practice medicine. The revocation was stayed, but his license was suspended indefinitely for a

minimum of two years. Appellant was eligible to apply for reinstatement on May 25, 1992.

Appellant filed the instant action to quiet title in certain properties so that he could sell them without Wooten's interference. The Wootens counterclaimed for fraud, intentional infliction of emotional distress, and invasion of privacy. The quiet title action was dismissed before trial. The case proceeded to jury trial on the counterclaim. The court directed a verdict for appellant as to fraud and intentional infliction of emotional distress. The trial court also dismissed Jacqueline Dawson as a defendant to the invasion of privacy claim. On the invasion of privacy claim against Bruce Dawson, the jury found for appellees, awarding compensatory damages of $5,044 and punitive damages of $45,000. Subsequent to trial, the trial court awarded attorney fees of $11,686.19. The court also nullified certain property transfers as fraudulent conveyances.

On March 31, 1992, the trial court overruled appellant's request for JNOV and new trial.

Appellant appealed the judgment on the jury verdict (February 24, 1992), and the judgment on attorney fees and fraudulent conveyance (February 26, 1992) in case No. 92–CA–49. Appellant also appealed the judgment overruling his motion for new trial and JNOV in case No. 92–CA–50.

I

Assignment of Error No. 3

This assignment alleges that appellant's original trial counsel acted improperly. We review the actions of trial courts, not attorneys.

The first assignment of error is overruled.

II

Issues of credibility are for the trier of fact, not the reviewing court. *State v. Tyler* (1990), 50 Ohio St.3d 24, 32, 553 N.E.2d 576, 587, certiorari denied (1990), 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 334.

The second assignment of error is overruled.

III

Assignments of Error Nos. 1 and 10

*Pleadings:* Appellant argues that the complaint does not state a claim for invasion of privacy. Civ.R. 8 requires that a claim for relief contain a short,

plain statement of the claim, showing that the pleader is entitled to relief, and a demand for judgment.

Appellees pleaded in their counterclaim that appellant intentionally used Wooten's name, address, social security number, and driver's license to accomplish a scheme of hiding assets. (Paragraphs one and three of the counterclaim.) Appellant received confidential and proprietary information from Wooten through his position as Wooten's physician. (Paragraph four of the counterclaim.) The counterclaim further alleged that appellant converted for his own personal use and gain Wooten's identity, including his good standing in the community, reputation, and credit worthiness. This is sufficient to state a cause of action for invasion of privacy.

*Manifest weight:* A judgment supported by some competent, credible evidence going to all the elements of the case will not be reversed as against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

One who appropriates to his own use or benefit the name or likeness of another is subject to liability for invasion of privacy. *Vinci v. Am. Can Co.* (1984), 9 Ohio St.3d 98, 9 OBR 326, 459 N.E.2d 507, paragraph two of the syllabus. This use need not necessarily be commercial. *Id.*

By his own admissions at trial, appellant used appellee's surname and variations of his initials to buy a gun, acquire his birth certificate, acquire his driver's license, renew the driver's license twice, open post office boxes, open bank accounts, and transfer and hold assets. He continued to use Wooten's identity for his own purposes for approximately eight years. This is clearly sufficient evidence to support the judgment for invasion of privacy.

The third assignment of error is overruled.

## IV

### Assignments of Error Nos. 2, 5, 6, 7 and 10

*Compensatory damages:* Appellant argues that there is no evidence of actual damage to appellees.

After they became aware that someone was using a duplicate of Wooten's driver's license, appellees embarked upon an investigation to try to find that person. They were particularly concerned about the purchase of a handgun. They received virtually no aid from the governmental authorities, so they had to invest their own time and money. Due to the nature of Mr. Wooten's business, he lost money for each hour spent away from the job during normal working hours. He incurred expenses of $320 for an attorney

(not trial counsel) he consulted after discovering what Dawson had done, in order to protect himself from possible legal problems related to the property titled in his name. Appellees also submitted to the jury a breakdown of lost wages, travel, and telephone calls, and a breakdown of the related expenses. Exhibit Nos. 42 and 43. These expenses totaled $4,724. The combination of the investigation expenses and the bill for the attorney supports the jury's award of $5,044 for compensatory damages.

*Punitive damages:* Actual malice, necessary for an award of punitive damages, may be proven by showing a conscious disregard for the rights and safety of other persons, that has a great probability of causing substantial harm. *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus.

Appellant bought a handgun and titled it to appellee. He transferred property into various trusts in appellee's name, although he admitted that he did not know how to properly set up such trusts. These actions clearly could have caused substantial problems for Wooten. Further, Wooten was unable twice to renew his own driver's license due to the conduct of appellant.

Appellant recognized that if Wooten discovered what he had done, Wooten would have been emotionally traumatized.

"Well, you know, you never like to—no doctor wants to be known for maiming his patients. I never knew he would find anything out about it. It was obviously my clumsy attempts and bungled the thing that worked out that way. So I thought, my God, this guy has been—this has been going on for years and years, and he knew about it all this time. He must have felt horrible. * * *"

Nevertheless, appellant intentionally embarked on an eight-year scheme to hide assets by assuming the identity of one of his patients, while disregarding the problems that he could cause Wooten by his actions. The award of punitive damages was not error, and no violation of appellant's constitutional rights occurred by such award.

The fourth assignment of error is overruled.

V

Assignments of Error Nos. 4, 8 and 11

*Discovery:* The record reveals no errors in the court's procedures concerning discovery.

*Right to represent himself:* Appellant hired Attorney Ennen to represent him at trial. There was no indication that appellant was acting as

co-counsel. At the June 9, 1992 hearing on a contempt motion, the court addressed the problem of appellant attempting to act on his own behalf:

"* * * [W]ell, first of all, Mr. Dawson, I don't like anyone filing stuff on their own behalf without consulting with their counsel. Either you have counsel or you don't have counsel, which brings up the other matter.

"Let's dispose of it right now. The motion to strike which was filed by the defendant Wooten is granted. The information filed on August 16th by Jacqueline Dawson and Bruce Dawson are stricken from the file."

Appellant appeared at trial with counsel. The court did not abuse its discretion in preventing appellant from raising his own objections.

*Jury instructions:* The court's instructions to the jury on right to privacy and punitive damages correctly stated the law.

*Attorney fees:* Prior to trial, both parties agreed that the issue of attorney fees would be submitted to the court after trial. Any possible error is therefore waived.

*Post-trial motions:* The motions for JNOV and new trial were extensively briefed. Appellant has demonstrated no prejudice from the failure of the trial court to hold an oral hearing.

The fifth assignment of error is overruled.

VI

Assignment of Error No. 9

Appellees' counterclaim alleged that since 1981, appellant set upon a course of conduct to secret away real and personal property. (Paragraph one of the counterclaim.) The counterclaim further alleged that this course of conduct was designed at least in part to shield appellant's assets from creditors. (Paragraph two of the counterclaim.) The counterclaim alleged that in this course of conduct, appellant intentionally and with malice aforethought used Wooten's personal information to accomplish his scheme. (Paragraph three of the counterclaim.) These allegations, coupled with appellees' later motion for equitable relief, were sufficient to bring before the court the issue of fraudulent conveyance and to allow the court to nullify such conveyances.

R.C. 1336.04(A)(1) provides:

"A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

"(1) With actual intent to hinder, delay, or defraud any creditor of the debtor."

The court found that Dawson "has made it very clear that his intent was to conceal assets, hinder creditors in determining the extent of his assets, and to defraud potential creditors." Judgment Entry, February 26, 1992. The court thus made the finding that appellant's actual intent was to defraud his creditors, in accordance with R.C. 1336.04(A)(1). This finding is clearly supported by evidence from the trial.

However, the judgment as it presently stands is not self-executing. The trial court ordered that:

"* * * [A]ll transfers of assets of any kind into a trust, into the name of a family member, or into any alias name which occurred on or after August 8, 1980 is hereby declared a nullity and those assets are subject to any action in aid of execution brought by the defendants to satisfy the judgment entered herein."

The judgment does not state with specificity the transfers that are to be nullified. This cause is therefore remanded to the Licking County Common Pleas Court to state with specificity the transfers that are nullified.

The judgment of the Licking County Common Pleas Court is affirmed, and the cause is remanded to that court to state with specificity the transfers nullified by the February 26, 1992 judgment.

*Judgment affirmed*
*and cause remanded.*

GWIN, P.J., and HOFFMAN, J., concur.