Following a trial in the Montgomery County Court of Common Pleas, Leo Montgomery was found guilty of murder, with a firearm specification, and having a weapon while under disability. Montgomery was sentenced accordingly, and he appeals.
On November 3, 1997, Montgomery shot and killed Vinson Smith in front of Montgomery's apartment located at 4850 Biddison Avenue in Trotwood, Ohio. An indictment filed on December 17, 1997 charged Montgomery with one count of murder, with a firearm specification, and one count of having a weapon while under disability. Montgomery pleaded not guilty to the offenses.
At trial, the state presented the following evidence.
Michele Silvey testified that, at approximately 2:00 p.m. on November 3, 1997, she, Montgomery, and their three-year daughter had been asleep in their upstairs bedrooms when Smith knocked on the front door. From the bedroom window, Montgomery asked Smith what he wanted, and Smith replied, "We need to talk. You just need to come down here so we can talk." Montgomery got dressed, walked downstairs to find that Smith was no longer there, and sat down in the living room. From upstairs, Silvey heard Montgomery and La Chuanse, a.k.a. "Chance," Dickerson, who had just arrived with his girlfriend, Michelle, go outside upon Smith's return. Silvey heard Smith "telling Monty to stop short-stoppin'," i.e., trying to stop Smith's drug clientele from going to Smith's door, Montgomery telling Smith to "back up off of him" and asking Smith "why he's walkin' up on him," and Smith asking why Montgomery had a gun. Silvey occasionally looked out the upstairs front window to see parts of the confrontation between Montgomery and Smith.
Several other witnesses testified to their observations of the shooting incident that had occurred in front of Montgomery's apartment. David K. Hooten, a mail carrier who was delivering a package at the Albright Apartment Complex on the afternoon of November 3, 1997, testified that he had seen Montgomery and Smith standing a few feet away from each other, appearing "loud and somewhat angry" and "somewhat hostile towards one another," and engaging in "a somewhat heated argument" not involving physical contact. Janis Anderson testified that she had heard a loud argument between Montgomery and Smith and had seen Smith standing "[u]p in [Montgomery's] face" near Montgomery's front door. Twelve-year-old Whitney Manning testified that she had heard "[l]oud arguing" and "yelling" that "sounded as someone was goin' to get hurt" and had seen Montgomery pull a gun from his clothing and point it at Smith while saying, "You better get outta my face." According to Anderson, after Montgomery had cocked his gun and told Smith to step back, he fired a shot toward the ground, prompting Smith to turn around and walk toward the street. Anderson stated that Smith then turned back around and approached Montgomery "in a fast pace" and that, as the two men faced each other, Montgomery had fired several shots that sounded "just like boom, boom, boom." Anderson and Manning saw Smith fall to the ground. Anderson went into an apartment and, upon hearing more shots, she looked outside and saw Montgomery walk toward a parked car, walk back to the spot where he had dropped a bullet, reload the gun, and fire another shot near Smith's body. Hooten testified that he had seen "an individual laying in the grass area and another individual standing over him with a gun." Vickie Harris, Manning's mother, testified that she had looked out her front window and had seen Smith lying on the ground and Montgomery standing about two feet away from his body, pointing the gun at Smith's head and firing. Both Silvey and Anderson testified that Montgomery, Dickerson, and Michelle had driven away from the scene in Michelle's car. After dialing 911, Harris ran outside to help Smith, whom she found to be alive and moaning.
Silvey and Manning, neither of whom had watched the entire incident, testified that they had not seen Smith display or reach for a weapon or physically assault Montgomery. Harris testified that, while she was assisting Smith, she had not seen or felt a weapon on his person and that no one had removed any weapons from his person while he was lying on the ground. Officer Michael Pigman testified that he had searched Smith's clothing and did not discover any weapons.
Officer Pigman further testified that he had inspected the scene and had found six spent shell casings from a three-eighty caliber gun, a "spent projectile," and a live round of three-eighty ammunition in the front area of 4850 Biddison Avenue.
Dr. Gary Telgenhoff, the pathologist who had performed the autopsy of Smith, testified that Smith had suffered gunshot entrance wounds to the left side of his face, to his left upper abdomen, to the left upper back region, and to the back side of his left upper arm near the shoulder.
Montgomery testified on his own behalf, asserting that he had acted in self-defense.
He explained that, since July 1997, there had been problems between him and Smith, caused by Smith's accusations that he was "short stoppin'" and was showing a romantic interest in Smith's girlfriend, Sandra Stallings. He testified that on November 3, 1997, when Smith had knocked on the door the first time, Smith had said, "I need to holler at you" and when Smith had come back the second time, Smith had accused him of short-stopping. According to Montgomery, he had stepped outside the front door, Smith had walked "all the way to [his] face," and the two of them had stood "[c]hest to chest" arguing for about five to ten minutes when Smith said, "I got somethin' for you," which Montgomery understood to mean that he had a weapon. Montgomery stated that, although Smith did not display a weapon, Smith had reached under his coat, prompting him to pull a gun from his waistband and cock it. He testified that after holding the gun out for a few seconds, he put it back in his waistband, at which point Smith pulled his hand out from under his coat and said, "You — you's a `ho; you's a `ho, Man. You gonna stop steppin' on my toes? Keep your business on your side of the apartment and I do my business on my side of the apartment" to which Montgomery responded, "You ain't runnin' that and I go where I wanna go." According to Montgomery, while the argument continued, Smith started walking toward Biddison Avenue and "[k]ind of" surprised him by stopping and then coming back calling him a, "`ho ass nigger." Montgomery stated that, in response to the name calling, he had said, "Fuck you, nigger." He further testified:
 He said: "Well, what you wanna do then?" I say: "Whatever." And he reaches under his coat. By the time he get it — get under his coat, he tugs, tugs at somethin'. I don't know what it was. But it scared me. So I pulled mine out and I — I shoot.
When asked what he had been thinking when he saw Smith tug at something under his coat, Montgomery said, "Survive. Stay alive. And not get shot." Montgomery stated that he had been standing on his "porch" about two feet away from Smith, who was then standing on the grass, when he "panicked and just shot." He further testified that, although he had walked toward Michelle's car, he had turned back to get some money from inside the apartment when he stopped next to Smith's body, at which point the gun came unjammed and went off again.
Montgomery presented the testimony of other witnesses to support his theory that he had shot Smith in self-defense. Stallings testified that, while watching the confrontation between Smith and Montgomery, she had thought that "they [were] about to fight" and had seen Montgomery pull out his gun, point it at Smith, and fire the first shot. Stallings testified on cross examination that, contrary to rumors that she had made statements about removing a gun from Smith's clothing after the shooting incident, Smith had not carried a gun that day and she had not gotten close enough to him to remove anything from his person. Pamela Bradley, a friend of Stallings, testified that Stallings had told her, "I thought I took everything out of his pockets. I don't know how I left the dope. He must've [been] layin' on it when I took the gun and the money." Bradley and Gurney Hale, a cousin and neighbor of Montgomery, testified that they had seen Smith try to start fights with Montgomery during the summer and fall of 1997.
Dickerson testified that, upon seeing Smith walk toward Montgomery's apartment prior to the confrontation, he had told Montgomery that Smith was coming, and Montgomery then stepped out onto his front "porch." According to Dickerson, Smith "got in [Montgomery's] face," backed away while "grabbin' like for his coat or whatever, around his waist" and saying, "You're a whore ass nigger," and then turned around and walked back toward Montgomery "pretty fast," acting "real hostile" while continuing to insult Montgomery, unzipping his coat with one hand, and pointing at Montgomery with the other. On cross examination, Dickerson admitted that he had not seen Smith display a weapon. Dickerson was also cross examined on the fact that, in previous statements to detectives and to the grand jury, he had not indicated that Smith appeared to have been reaching for a weapon. The state pointed out Dickerson's statements to detectives that he had not thought Montgomery was in "terrible danger" during the argument and that he could not think of any reason why Montgomery had pulled a gun on Smith.
On April 30, 1998, the jury returned a guilty verdict on the charge of murder with a firearm specification. Montgomery entered a guilty plea to the offense of having a weapon while under disability. The trial court imposed consecutive sentences of fifteen years to life imprisonment for murder, three years actual incarceration for the firearm specification, and twelve months for having weapons while under disability. Montgomery appeals, raising two assignments of error.
 I. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT REFUSED APPELLANT'S REQUEST TO INSTRUCT ON THE LESSER INCLUDED OFFENSE OF VOLUNTARY MANSLAUGHTER.
Montgomery contends that the trial court erred in refusing to instruct the jury on the offense of voluntary manslaughter.
Following jury instructions, the following dialogue occurred:
 JUDGE BROWN: Does the Defendant have any additional Requests to Instruct?
 MR. PIERSON: At this time we would ask that a * * * Manslaughter Instruction be given in * * * this case. I have nothing further to say other than make that request.
 JUDGE BROWN: Well, obviously the Involuntary Manslaughter would not fit. There is no underlying felony or misdemeanor. As to the Voluntary Manslaughter, Counsel for the Defendant has argued far more eloquently than I could ever express, the fact that this was not a sudden situation. This is a situation which grew over a period of time.
 I do not feel that because of the factual situation here that this was a case of sudden anger or sudden passion, this sort of thing, which would require the giving of * * * a Voluntary Manslaughter Instruction. Therefore, the request is denied.
When asked if he had any objections to the instructions as given "other than the additional request," Montgomery replied, "Right."
Crim.R. 30(A) provides:
 At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. Copies shall be furnished to all other parties at the time of making the requests. The court shall inform counsel of its proposed action on the requests prior to counsel's arguments to the jury and shall give the jury complete instructions after the arguments are completed. The court also may give some or all of its instructions to the jury prior to counsel's arguments. The court need not reduce its instructions to writing.
 On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.
When the trial court gives incomplete or incorrect jury instructions, "the error is preserved for appeal when the defendant objects in accordance with the second paragraph of Crim.R. 30(A), whether or not there has been a proffer of written jury instructions in accordance with the first paragraph of Crim.R. 30(A)." State v. Williford, (1990), 49 Ohio St.3d 247, paragraph three of the syllabus. Failure to expressly object to the jury instructions does not waive the issue for appellate review when the record affirmatively demonstrates that the trial court "was fully apprised of the law and defense counsel's requests" for an instruction on a lesser offense. State v. Mack
(1998), 82 Ohio St.3d 198, 200, citing State v. Wolons (1989),44 Ohio St.3d 64, paragraph one of the syllabus; Williford,49 Ohio St.3d 247, at paragraph three of the syllabus.[1]
By objecting to the trial court's refusal to instruct the jury on the lesser offense of voluntary manslaughter, Montgomery preserved the error for appellate review. The offense of voluntary manslaughter is defined at R.C. 2903.03(A):
 No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *.
Voluntary manslaughter is "an inferior degree of murder." Statev. Rhodes (1992), 63 Ohio St.3d 613, 617. "[A] defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." State v. Shane (1992),63 Ohio St.3d 630, 632. The defendant bears the burden of establishing "by a preponderance of the evidence the existence of one or both of the mitigating circumstances." Rhodes,63 Ohio St.3d at 617-618. The mitigating circumstances of provocation involves both objective and subjective components:
 In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied. Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage. It is only at that point that the "* * * emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time * * *" must be considered. [State v. Deem
(1988), 40 Ohio St.3d 205], paragraph five of the syllabus. If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction. In that event, the objective portion of the consideration is not met, and no subsequent inquiry into the subjective portion, when the defendant's own situation would be at issue, should be conducted.
 Shane, 63 Ohio St.3d at 634 (footnote omitted).
Reasonably sufficient provocation is that which is "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." Id. at 635. Generally, the victim's "mere words" do not constitute reasonably sufficient provocation. Id. at 637. Whether the defendant has presented evidence of reasonably sufficient provocation must be decided by the trial court as a matter of law, based on the specific case facts viewed most favorably to the defendant. Id. at 637.
On appeal, Montgomery claims that, had the instruction been given, the jury could reasonably have acquitted him of murder and found him guilty of voluntary manslaughter. To support his claim that the provocation was reasonably sufficient to bring on a sudden passion or a fit of rage, he refers to testimony of the "heated argument" between him and Smith and testimony that Smith came to his apartment accusing him of short stopping, "got in his face," and caused him to fear that Smith was armed by walking back toward him at a "pretty fast" pace, appearing "real hostile," and tugging at his clothing. The state insists however, that Montgomery's own testimony that he was "nervous" and not angry during the argument and that he was not insulted by the names that Smith called him manifested that he had not been under the influence of a sudden passion or in a sudden fit of rage.
Although we do not agree with the trial court's reasoning that the existence of an ongoing dispute between Montgomery and Smith necessarily precluded "a case of sudden anger or sudden passion," the trial court did not err in refusing to instruct the jury on voluntary manslaughter because Montgomery did not present evidence sufficient to show that he was reasonably provoked to use deadly force against Smith. The eyewitness testimony of Hooten, Anderson, and Manning demonstrated that the confrontation between Montgomery and Smith had not involved any physical contact. Additionally, Montgomery's testimony that the argument was a dispute about Smith's accusations of short-stopping and "steppin' on [his] toes" showed that their argument, although "heated," was not the type to provoke a reasonable person to respond with deadly force. Consequently, no reasonable jury could have found that Montgomery was reasonably provoked by Smith's accusations and name calling, and it was not error for the trial court to refuse to instruct the jury on the offense of voluntary manslaughter.
The first assignment of error is overruled.
 II. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT FAILED TO INSTRUCT THE JURY THAT, AS TO HIS SELF-DEFENSE DEFENSE, THE APPELLANT HAD NO DUTY TO RETREAT FROM HIS HOME.
Montgomery contends that the trial court erred by failing to explain to the jury that he had not had a duty to retreat from the confrontation with Smith because he had been at home.
Although the trial court instructed the jury on the elements of self-defense, it did not give any further instruction on circumstances when a defendant has no duty to retreat. Montgomery urges that he was not under a duty to retreat because he was standing on his "porch," an area recognized as part of one's home from which retreat is not required. The state insists, however, that Montgomery did have a duty to retreat because he "was instead standing on a raised concrete platform, which he shared with the adjacent apartment" and which did not constitute a porch for the purposes of the "no [duty to] retreat" rule because it did not provide "shelter or privacy."
"[T]he criminal defendant is entitled to have the trial court give complete and accurate jury instructions on all the issues raised by the evidence." State v. Sneed (1992), 63 Ohio St.3d 3,9. When the defendant fails to comply with either paragraph of Crim.R. 30(A), we review the trial court's conduct for plain error. See Mack, 82 Ohio St.3d at 200; Williford, 49 Ohio St.3d 247, at paragraph three of the syllabus; Wolons, 44 Ohio St.3d 64, at paragraph one of the syllabus. The record in this case does not contain a written request for an instruction on the "no duty to retreat" rule, and it does not reflect that Montgomery expressly objected to its omission or that the trial court was fully apprised of the law governing the issue. Thus, Montgomery waived the right to challenge the issue on appeal, and we will review the trial court's conduct regarding this issue for plain error.
To meet the burden of proving the affirmative defense of self-defense, the defendant must show that (1) he was not at fault for creating the situation, (2) he had a "bona fide belief that he was in imminent danger of death or great bodily harm," which he could only escape by using force, and (3) he did not violate a duty to retreat or to avoid the danger. State v. Robbins (1979),58 Ohio St.2d 74, paragraph two of the syllabus.
"If the defendant fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." State v. Jackson (1986), 22 Ohio St.3d 281,284. The jury in this case heard eyewitness testimony that Smith had not displayed or reached for a weapon or physically assaulted Montgomery, that after Smith had already fallen to the ground, Montgomery started to flee and then walked back to fire another shot in the direction of Smith's body, that Smith had not had a weapon on his person when he was lying on the ground, and that no weapons were discovered during the police search of Smith's clothing. Although Montgomery claimed to have been in fear that Smith had carried a concealed weapon and was going to shoot him, Montgomery and Dickerson both admitted that Smith did not display a weapon. On cross examination, Dickerson admitted to having told detectives that he had seen no reason for Montgomery to shoot at Smith. This testimony may well have caused the jury to disbelieve Montgomery's claim of self-defense. In other words, the jury could have reasonably concluded that Montgomery had failed to show that he had had a bona fide fear of imminent danger of death or great bodily harm, which he could only escape by using force. See Robbins, 58 Ohio St.2d at 74, paragraph two of the syllabus. Thus, the absence of a "no duty to retreat" instruction did not clearly affect the outcome of the trial, and the trial court did not commit plain error in not instructing the jury on the "no duty to retreat" rule.
The second assignment of error is overruled.
The judgment of the trial court will be affirmed.
GRADY, P.J. and YOUNG, J., concur.
[1] The supreme court appears to have relaxed the error preservation criteria for instructions on lesser offenses that we adopted in State v. Colston (Dec. 17, 1993), Montgomery App. No. 13599, unreported. InColston, we held that, pursuant to State v. Tyler
(1990), 50 Ohio St.3d 24, 36, to preserve a possible error involving the trial court's refusal to instruct the jury on a lesser included offense, the defendant must comply fully with Crim.R. 30(A), by both filing a written request for the instruction and objecting on the record to the trial court's failure to give the requested instruction before the jury retires.