OPINION
Defendant-appellant, Jabarri McKinzie, appeals from the September 27, 2000 judgment of conviction of the Franklin County Court of Common Pleas finding him guilty of murder with a firearm specification and sentencing him to fifteen years to life in prison plus three years of actual incarceration for the use of a firearm. For the reasons that follow, we affirm in part, reverse in part, and remand the matter for resentencing.
Appellant was indicted on November 5, 1999, on one count of aggravated murder with a firearm specification, in violation of R.C. 2903.01 and 2941.145. The charges arose out of an incident that occurred on December 29, 1996, when Karen Banks was found shot to death inside her apartment at 3032 Bellwood Court, in the Greenbriar apartment complex. Ms. Banks had been shot at close range one time in the head with a shotgun.
At trial, the prosecution presented evidence that appellant, who was known as "Mike" or "Big Mike," along with three other men known as "Sean," "Nate," and "Capone," regularly sold crack cocaine out of Ms. Banks' apartment, and that appellant killed Ms. Banks after a bag of drugs turned up missing. On the day of the murder, Ms. Banks telephoned her friend, Manari Willingham to tell her that a bag of drugs was lost and to ask her to come to the apartment to help her find it. Ms. Banks mentioned that Sean and Big Mike were at her apartment at the time. Ms. Willingham agreed to go over to the apartment, but she had to arrange for a ride. Ms. Willingham had heard appellant say in the past that if any of his drugs came up missing, "he would kill the mother fucker for fucking with his shit." (Tr. 325.)
While Ms. Willingham was on her way to the apartment, Ms. Banks repeatedly telephoned Jacqueline McKeever, Ms. Willingham's mother. Ms. Banks told Ms. McKeever that she was scared because she had "smoked their stuff" and was afraid they were going to kill her. (Tr. 237-240.) Ms. McKeever asked who "they" were, and Ms. Banks replied "Mike." (Tr. 240.) During the final call, Ms. Banks told Ms. McKeever that "he is going to kill me," and the phone went dead. (Tr. 241.) When Ms. Willingham arrived at the apartment, she discovered Ms. Banks lying dead on the couch with the phone in her hand.
Markale Lundy, who was fourteen or fifteen at the time, lived in the apartment across from Ms. Banks. Mr. Lundy testified that he was home playing with his Play Station video game. He looked out the peephole of his apartment when he heard somebody arguing in the hallway. Mr. Lundy saw three women arguing, one of whom was Ms. Banks. Mr. Lundy heard one of the women saying something like "you keep messing up his money." (Tr. 274.) About thirty minutes later, Mr. Lundy looked out the peephole again when he heard more arguing. This time he saw appellant and Ms. Banks arguing. Mr. Lundy heard appellant say "I am getting tired of this." (Tr. 274-275.) Mr. Lundy returned to his Play Station game, and a short time later heard a loud boom. Mr. Lundy looked through the peephole and saw appellant, who he knew as "Mike," leave the apartment. After getting on the phone for a few minutes and playing his game a while longer, Mr. Lundy smelled something that he thought was "burnt hair." He opened his door and saw Ms. Banks "laying on the couch with a hole in her head." (Tr. 275.)
Kevin Thomas, also known as "Capone," testified that he was appellant's drug supplier, and that he stored a shotgun at Ms. Banks' apartment. Mr. Thomas testified that, on the day of the murder, appellant and Ms. Banks got into an argument over missing drugs and that appellant told Ms. Banks, "Karen, you better help me find this shit. Find it, bitch, or I am going to hurt you. I am going to kill you." (Tr. 599.) Mr. Thomas decided to leave, went home, took a nap, and woke up to a live news report on the television about the murder.
Mr. Thomas paged appellant, and the two of them went to a Red Lobster restaurant, where Mr. Thomas asked appellant "what is going on?" To which appellant replied, "[t]here ain't nothing much. You know, I shot her." (Tr. 604.) Appellant then told Mr. Thomas that while Ms. Banks was on the phone he put the shotgun that Mr. Thomas had purchased to her head and fired. Appellant assured Mr. Thomas that he had gotten the gun out of the apartment. About two weeks later, appellant met up with Mr. Thomas at another apartment where appellant cut the shotgun up into little pieces with a hacksaw, put it all in a pillowcase, and said he would get rid of everything.
Appellant took the stand in his own defense and admitted being a drug dealer but denied ever being in Karen Banks' apartment or selling drugs out of her apartment. The jury found appellant guilty of the lesser-included offense of murder as well as the firearm specification. The trial court sentenced appellant to a prison term of fifteen years to life plus three years imprisonment for the firearm specification. This appeal followed, and appellant assigned as error the following:
FIRST ASSIGNMENT OF ERROR:
 The Trial Court Erred in Overruling Defendant's Objection to the Venire under Batson v. Kentucky, 476 U.S. 79 (1986).
SECOND ASSIGNMENT OF ERROR:
 The Court Erred by Not Declaring a Mistrial or Giving a Cautionary Remark, after the Jury was Tainted by the Remarks of Mr. Oscar Schirtzinger During Voir Dire.
THIRD ASSIGNMENT OF ERROR:
 The Trial Court Erred in Overruling Defendant's Rule 29 Motion and by Permitting the Jury's Guilty Verdict, Which was Both Against the Manifest Weight of the Evidence, and Based upon Insufficient Evidence. Due Process Clause, Fourteenth Amendment, United States Constitution; Section 16, Article I, Ohio Constitution; O.R.C. 2901.05(A).
FOURTH ASSIGNMENT OF ERROR:
 The Trial Court Erred in Overruling Defendant's Motion to Suppress Identification by Kevin Thomas and Markale Lundy. (Stovall v. Denno,) 388 U.S. 293 (1967).
FIFTH ASSIGNMENT OF ERROR:
 The "Judgment Entry (Prison Imposed)" improperly credited Mr. McKinzie with Zero Days of Jail Time Credit, to Mr. McKinzie's Prejudice.
SIXTH ASSIGNMENT OF ERROR:
 Mr. McKinzie was Denied the Effective Assistance of Counsel at the Trial Court Level in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution, and Article 1, Sections 2, 9, 10
and 16 of the Ohio Constitution.
SEVENTH ASSIGNMENT OF ERROR:
 The Trial Court Erred in Overruling Defense Counsel's Objections to Testimony and Exhibits.
In his first assignment of error, appellant contends that the state peremptorily excused the only potential African-American juror on the basis of his race and, thus, denied appellant equal protection under the law pursuant to Batson v. Kentucky (1986), 476 U.S. 79.
Mr. Anderson was the only African-American who was moved into the jury box during voir dire. (Tr. 118.) Prior to being moved into the jury box, Mr. Anderson had stated that he had a friend who was a homicide detective with the Columbus police:
MS. MOORE: Mr. Anderson?
 MR. ANDERSON: I don't know if I put it on there. I do have a friend that is a Columbus police officer.
MS. MOORE: Who is that?
MR. ANDERSON: His name is Ralph Taylor.
MS. MOORE: A homicide detective?
MR. ANDERSON: Yes.
 MS. MOORE: Is there anything about that relationship that might affect you in this case?
MR. ANDERSON: It shouldn't.
 MS. MOORE: He is not involved in this case in any way at all. Just so you know that.
 Is there anything else I should know about that as far as it would influence the case?
MR. ANDERSON:
No. [Tr. 18-19.]
A second exchange took place between defense counsel and Mr. Anderson prior to his being moved into the jury box:
 MR. SCHUMACHER: What do you think are the most important qualities that a juror ought to bring into this courtroom?
* * *
MR. ANDERSON: A degree of empathy.
MR. SCHUMACHER: For whom, which one?
MR. ANDERSON: Whoever. This is my first time.
MR. SCHUMACHER: You are doing fine.
MR. ANDERSON: The one that is being questioned.
MR. SCHUMACHER: A witness?
MR. ANDERSON: Right.
 MR. SCHUMACHER: That is not an easy job to be a witness.
 MR. ANDERSON: Right. You try to feel out where they are coming from and not take sides. Just have an open mind.
 MR. SCHUMACHER: Empathy is one of those things we would like to think — you will be told at the appropriate time, when the judge gives you instructions — he is going to give you instructions of law.
Judge, do you do written instructions also?
THE COURT: Correct.
 MR. SCHUMACHER: Thank you. You will get written instructions, too. One of the things you will be told is, while all of those emotions are appropriate, you are supposed to make your decision on the law, not based on sympathy.
Does that make sense?
MR. ANDERSON: Yes.
 Mr. SCHUMACHER: I know there is a difference. But with some people it can be a subtle difference sometimes. [Tr. 54, 55-56.]
Defense counsel then later asked Mr. Anderson a series of questions about assessing witness credibility:
 MR. SCHUMACHER: Mr. Anderson, one of the big things we talk about in looking at the evidence in a case — and usually we do it in regard to testimony — is the idea of credibility. Again, you are going to be charged at the appropriate time on that. It basically means is the testimony worthy of belief.
Does it make sense?
MR. ANDERSON: Yes.
 MR. SCHUMACHER: Do you have to make that kind of a decision in your daily life when somebody is telling you something that is credible?
MR. ANDERSON: I would say so.
 MR. SCHUMACHER: Most of us have to do it all the time, don't we?
 What kind of things do you look for, when you have got somebody that you don't know that is telling you something, to decide whether or not they are telling you the truth, whether they are believable?
MR. ANDERSON: The flow of their conversation.
 MR. SCHUMACHER: Their manner of testifying or speaking?
 MR. ANDERSON: Right. And whether it makes sense, it adds up.
 MR. SCHUMACHER: Whether it is consistent with the other things that you know about, whatever subject you are talking about, right?
MR. ANDERSON: Yes.
 MR. SCHUMACHER: Does it fit or is it inconsistent, right?
MR. ANDERSON: Right. [Tr. 92-93.]
Finally, in response to further questions about assessing credibility, one juror was asked if she would look at body language and the juror gave a positive response. Mr. Anderson commented:
 MR. ANDERSON: I wouldn't agree with the body language. A person can be nervous and telling the truth, as opposed to someone who is not telling the truth, and the body motions might give off the same sign as the person being nervous and the person that is not telling the truth.
 MR. SCHUMACHER: You may want to consider that, but you have got to be careful about it, don't you?
MR. ANDERSON: Right.
 MR. SCHUMACHER: Because you could get a wrong signal.
MR. ANDERSON: Right. [Tr. 95-96.]
In Batson, supra, the United States Supreme Court held that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of its peremptory challenges as to exclude members of minority groups from service on petit juries. Id. at 89; see, also, State v. Hernandez (1992), 63 Ohio St.3d 577, 581. Batson has since been extended to criminal defendants who are not of the same race as the excluded jurors, Powers v. Ohio (1991), 499 U.S. 400; civil cases, Edmonson v. Leesville Concrete Co., Inc. (1991), 500 U.S. 614; defense peremptory challenges, Georgia v. McCollum (1992), 505 U.S. 42; and gender based peremptory challenges, J.E.B. v. Alabama ex rel. T.B. (1994), 511 U.S. 127. The burden of proof is on defendant to show that the state has used a peremptory challenge in a discriminatory manner. Batson, supra, at 96 S.Ct. 1723.
Following Batson, a three-step burden-shifting procedure was established to determine if the peremptory challenge is race based. First, the defendant, as the opponent of the strike, must establish a prima facie showing that the state purposefully discriminated in exercising a peremptory challenge to remove a prospective juror. To make a prima facie case of purposeful discrimination, defendant must demonstrate: (1) that members of a cognizable racial group were peremptorily challenged; and (2) that the facts and any other relevant circumstances raise an inference that the state used the peremptory challenges to exclude jurors on account of their race. State v. Hill (1995), 73 Ohio St.3d 433, 444-445.
If defendant makes a prima facie case of discrimination, the burden then shifts to the state to provide a race neutral explanation. Id. at 445. The neutral reason given by the state need not rise to the level justifying exercise of a challenge for cause. Batson, at 97. In fact, the United States Supreme Court has held that "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible. `* * * Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" Purkett v. Elem (1995), 514 U.S. 765, 767-768, quoting Hernandez v. New York (1991), 500 U.S. 352, 360 (plurality opinion).
Finally, the trial court must determine whether the neutral explanation offered by the state is credible or, is instead, a "pretext" for unconstitutional discrimination. Hernandez, at 363. The United States Supreme Court noted in Hernandez, "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." Id. at 365. Because the findings of the trial court largely turn upon the trial court's evaluation of credibility, reviewing courts should give the determinations of the trial court great deference. Id. Therefore, a trial court's findings of no discriminatory intent will not be reversed on appeal absent a determination that it was clearly erroneous. Id. at 369; see, also, Hernandez, supra, at 583, 589. In addition, the Ohio Supreme Court has stated that:
 * * * Trial judges must exercise considerable care in reviewing a claim of racial discrimination in jury selection. A judge should make clear, on the record, that he or she understands and has applied the precise Batson test when racial discrimination has been alleged in opposition to a peremptory challenge. * * * [Hicks v. Westinghouse Materials Co. (1997), 78 Ohio St.3d 95, 99.]
At the outset, this court notes that the trial court applied the appropriate analysis and found that appellant established a prima facie case of discrimination. In establishing a prima facie case, appellant could not point to a pattern of strikes against African-American jurors because Mr. Anderson was the only African-American called up to the jury box. However, as this court stated in State v. Belcher (1993),89 Ohio App.3d 24, 34, "[t]he striking of a single African-American juror without an adequate race-neutral explanation can result in a Batson violation, even where valid reasons exist for striking other African-American jurors."
Additionally, appellant pointed out to the trial court that there was nothing in the record that reflected that Mr. Anderson's answers stood out in any way. The prosecution had passed on its first three peremptory challenges and only when Mr. Anderson, an African-American, made it into the jury box did the prosecution exercise its first, and only, peremptory challenge. Appellant was able to point to a pattern of the prosecution passing on every peremptory challenge except that of Mr. Anderson, the one African-American called to the jury box. Thus, even without a pattern of striking more than one African-American from the jury panel, appellant met the burden of establishing a prima facie case.
We next proceed to an evaluation of the race neutral reasons proffered by the state in defense of its challenge. In articulating the basis for striking Mr. Anderson, the state responded as follows:
 MS MOORE: Your Honor, all three of us were troubled by his answer.[1] I can't remember exactly what the question was. It was where he talked about being empathetic, and that concerns us very much. He indicated that, in making his decisions, he would be empathetic. He also made some unusual comments about body language.
 He may have had a good point. I am not sure it was something that was valid, or that is something that we would like to have a juror doing.
 Therefore, that was why we were uncomfortable. It was primarily the comments about being empathetic that bothered us. [Tr. 119-120.]
The prosecutor's proffered explanation in this case, that she struck Mr. Anderson because she was uncomfortable about his comments about being empathetic, is race neutral. The prosecutor also indicated that Mr. Anderson also made "some unusual comments about body language." This too is a race neutral explanation. We agree with the trial court that neither of these reasons denied appellant equal protection. Therefore, we proceed with step three of the Batson inquiry.
Pursuant to the third step enunciated by the United States Supreme Court, following the state's proffer of a race neutral reason, the trial court must determine whether the reasons given were a mere pretext for an unconstitutional strike. In evaluating the prosecutor's race neutral reasons for using a peremptory challenge, the reviewing court must give the findings of the trial court great deference, since those findings rest largely upon the court's evaluation of the prosecutor's credibility. Batson, supra, at 98. The Ohio Supreme Court has held that a trial court's finding of no discriminatory intent will not be reversed on appeal unless clearly erroneous. Hernandez, supra, at 583. However, once the trial court proceeds to the third step of the analysis, the representations of the prosecutor that other criteria governed her decision must have some support in the record in order to be credible. See id. at 584 ("[w]hile self-serving comments by the prosecutor that he was not racially motivated are not sufficient to satisfy the burden of the state to demonstrate a race-neutral basis for its peremptory challenge, Batson, supra, the representations of the state in the present case that other criteria governed its decision are supported by the record"). Nevertheless, as noted by the Supreme Court of Ohio, "[t]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." State v. Gowdy (2000),88 Ohio St.3d 387, 393, citing Purkett, supra, at 768. Additionally, as the trial court had the opportunity to personally view the demeanor of the attorneys, this court gives great deference to the trial court's determinations of credibility.
After finding that the state had not made "the strongest argument" but noting that "it does not have to be the strongest argument," the trial court denied the Batson challenge. Almost immediately thereafter, the trial court indicated that it was taking a brief recess because it was "troubled with Mr. Anderson." (Tr. 121.) The trial court then returned to the bench and stated:
 We are back on the record. I feel that it is incumbent upon the court to make a determination to the effect that, once a race-neutral explanation has been tendered, I must then decide whether or not the striker opponent has proved purposeful, racial discrimination.
 A racially-neutral explanation tendered by the opponent of a peremptory challenge may not be persuasive or plausible. Persuasiveness of the justification only becomes relevant when the trial court determines whether the opponent of the strike has carried its burden of proof of purposeful discrimination.
 Based upon the information before me, I will go back to my original ruling as being a correct ruling. That ruling will stand. [Tr. 121.]
The trial court's remarks indicate that it believed that, while the state's race neutral justification for striking Mr. Anderson was not the most persuasive or plausible of explanations, appellant had failed in his ultimate burden of proving intentional racial discrimination. The trial court's decision in this regard was not clearly erroneous.
In overruling appellant's Batson objection, the trial court was apparently satisfied by the representations of the prosecutor that criteria other than race governed her decision. The explanation by the prosecutor was racially neutral on its face, and there is some support for the proffered reason in the transcript. Mr. Anderson indicated that he thought the most important quality a juror could bring into the courtroom was a degree of empathy. This troubled the prosecution and apparently was of enough concern to the defense counsel that he immediately told the jurors that they would be instructed that they were to base their decision on the law and not on emotion or sympathy. The trial court's determination that appellant did not meet his burden of establishing a racially motivated challenge is not clearly erroneous. The first assignment of error is not well-taken and is overruled.
In his second assignment of error, appellant argues the trial court erred by not declaring a mistrial or giving a cautionary instruction after one prospective juror made a series of inappropriate remarks concerning his views of the legal system and the probable guilt of defendants on trial. The final straw was when the prospective juror indicated that he was not sure that he could follow the instructions given by the court because, "I figured that anybody who is in this courtroom to be tried is probably guilty. And, if not totally guilty, he is so close to it that it doesn't matter." (Tr. 63-64.) At that point, the trial court called counsel up to the bench and indicated that "[m]y patience has just about run out with this person. I don't want him to answer anymore [sic] questions. I don't want him to taint this jury. If you don't mind, I will excuses [sic] him right now. We will move everybody up one."
The trial court then dismissed the juror prior to any challenges for cause. Counsel for the state and counsel for the defense both indicated that they had no objection to the trial court's decision. Defense counsel neither moved for a mistrial nor requested a cautionary instruction.
It is within the sound discretion of the trial court to grant or deny a motion for a mistrial. State v. Garner (1995), 74 Ohio St.3d 49, 59. Since there was no request for a mistrial or a cautionary instruction, we review the alleged error under the plain error standard. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. To prevail under the plain error standard, defendant must show that, "but for the error, the outcome of the trial clearly would have been otherwise." State v. Underwood (1983), 3 Ohio St.3d 12, 14.
Here, the comments were not so inflammatory or suggestive that the defense felt compelled to move for a mistrial or even request a cautionary instruction. The trial court took immediate action to prevent further remarks from this particular juror. Nothing in the record suggests that the jurors were tainted by the prospective juror's remarks during voir dire or that their deliberations were tainted. As such, we cannot find plain error in the failure to grant a mistrial. The second assignment of error is not well-taken and is overruled.
In his third assignment of error, appellant argues the evidence of his conviction was both insufficient and against the manifest weight of the evidence. Appellant points to the lack of any fingerprint evidence tying him to the scene of the murder, the lack of a murder weapon, and testimony of a witness that she heard more than one person in the background during her phone conversation with Ms. Banks. Appellant also points out that Markale Lundy, who was fourteen or fifteen at the time of the murder, "guessed" he lived in apartment No. 4, but the apartment number listed for him on the crime scene log was apartment No. 7. Lundy also testified that he did not leave his apartment between the time of the shooting and when his mother returned after dark, but the crime scene log shows him entering and leaving the crime scene twice, at 3:45 p.m. and at 5:42 p.m. Appellant contends that these inconsistencies raise doubts as to whether Lundy was where he says he was, and whether he was in a position to observe through the peephole in his apartment the events he testified about. Appellant also argues that Lundy hoped to receive judicial consideration on a sentence he was serving for burglary in exchange for his testimony.
Sufficiency of the evidence is the legal standard applied to determine whether a case should have gone to the jury. State v. Thompkins (1997),78 Ohio St.3d 380, 386. In other words, sufficiency tests the adequacy of the evidence and asks whether the evidence introduced at trial is legally sufficient as a matter of law to support a verdict. Id. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. Jenks, supra, at 273. If the court determines that the evidence is insufficient as a matter of law, a judgment of acquittal must be entered for defendant. See Thompkins, supra, at 387.
Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence. Thompkins, supra, at 387. In so doing, the court of appeals sits as a "thirteenth juror" and, after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id. (quoting State v. Martin [1983], 20 Ohio App.3d 172, 175); see, also, Columbus v. Henry (1995), 105 Ohio App.3d 545, 547-548. Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, supra, at 387.
Here, under either standard, there was more than ample evidence to convict appellant of the murder of Ms. Banks. On the day of the murder, appellant was arguing with Ms. Banks over missing drugs. Appellant threatened, "[b]itch, if you don't find them, I am going to kill you." (Tr. 594.) Prior to the shooting, appellant had been observed by numerous people holding a shotgun or keeping it close at hand at Ms. Banks' apartment. Right before the shooting, Ms. Banks called Ms. McKeever's house and told her that she was scared and afraid that "they" were going to kill her because she had "smoked their stuff." (Tr. 237-241.) When Ms. McKeever asked who "they" were, Ms. Banks replied "Mike." (Tr. 240.) During the final phone call, Ms. Banks told Ms. McKeever that "he is going to kill me," and then the phone went dead. (Tr. 241.) On the day of the murder, Markale Lundy saw appellant arguing with Ms. Banks. (Tr. 274.) Shortly thereafter, Lundy heard a loud boom, looked out the peephole of his apartment and saw appellant leaving Ms. Bank's apartment. (Tr. 275.) Lundy identified appellant in a photo array and in court and knew him as "Mike." (Tr. 282.) Finally, appellant confessed to three people. Appellant told James Hutson that he had shot a person at the Greenbriar apartment complex. (Tr. 498-499.) Appellant told Heather Ricken that he had shot a girl in the head at the Greenbriar apartment complex as an example, because she would not let him sell dope out of her house. (Tr. 521-522.) Appellant also told his supplier, Kevin Thomas, aka Capone, that he had shot Ms. Banks in the head with a shotgun while she was on the phone. (Tr. 604.) Thomas later observed appellant cutting a shotgun into little pieces with a hacksaw. (Tr. 608-609.)
Here, any inconsistencies raised by appellant do not rise to the level of an exceptional case where the evidence weighs heavily against a conviction. The fact that Jacqueline McKeever heard voices in the background during the last phone call is consistent with what other witnesses testified to about others being in the apartment shortly before the murder. Minor inconsistencies in Lundy's account do not render his story unbelievable. The fact that no murder weapon was recovered is consistent with Kevin Thomas' testimony that appellant destroyed the weapon.
As this court has previously stated, "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly, see [State v.] DeHass [(1967), 10 Ohio St.2d 230], such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236, unreported. It was within the province of the jury and the trial court to make the credibility decisions in this case. See State v. Lakes (1964), 120 Ohio App. 213, 217 ("it is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness").
After a thorough review of the record, appellant has not shown that the evidence was insufficient or that the jury lost its way. The third assignment of error is not well-taken and is overruled.
In his fourth assignment of error, appellant contends that the trial court erred in admitting the identification testimony of Markale Lundy and Kevin Thomas. Appellant contends that the procedure used in Thomas' identification of appellant was unduly suggestive in that detectives had a conversation with Thomas in which appellant's name was mentioned prior to showing him a photo array containing appellant's picture.
In State v. Perryman (1976), 49 Ohio St.2d 14, the Supreme Court of Ohio, citing Simmons v. United States (1968), 390 U.S. 377, 381, held that each case involving a photographic array must be considered in a case-by-case manner. The standard for admitting testimony concerning an out-of-court identification is whether there is a very substantial likelihood of irreparable misidentification. Neil v. Biggers (1972),409 U.S. 188, 198, citing Simmons, supra, at 384. Thus, even if the identification procedure utilized is suggestive, as long as the identification itself is otherwise reliable, the identification is admissible. Id. at 199.
In this case, detectives interviewed Kevin Thomas about the murder. On a subsequent occasion, the detectives showed Mr. Thomas three or four different photographic arrays and asked Mr. Thomas if any of the people in the arrays looked familiar to him. Mr. Thomas identified appellant as the person he knew as "Mike" as being in one of the arrays. Mr. Thomas also identified individuals in two other arrays. The procedure utilized by the detectives in presenting the arrays to Mr. Thomas was not suggestive so as to give rise to the likelihood of misidentification. Mr. Thomas knew appellant as he was his drug supplier, and Mr. Thomas had no trouble identifying the person he knew as "Mike."
Appellant also argues that Markale Lundy's identification of appellant should have been suppressed because prosecutors showed Mr. Lundy the photo array prior to his testimony at the suppression hearing. Mr. Lundy had previously identified appellant as the person he saw through the peephole of his apartment and as a person that he knew was selling drugs out of Ms. Banks' apartment. The prosecution's showing the array to Mr. Lundy before the suppression hearing did not taint the reliability of the previous identification. The fourth assignment of error is not well-taken and is overruled.
In his fifth assignment of error, appellant argues the trial court erred in giving him no credit for time served in jail while awaiting trial when the trial court had earlier indicated appellant was entitled to three hundred and thirty days of jail-time credit.
It is axiomatic that a court of record speaks only through its journal and not by oral pronouncement or mere written minute or memorandum. State ex rel. White v. Junkin (1997), 80 Ohio St.3d 335, 337; State v. Gary (1996), 117 Ohio App.3d 286, 288. Thus, because "a court of record speaks only through its journal * * * no action of the court can be regarded as a decision or judgment until it is reduced to writing and filed with the clerk for journalization." State v. Law (Dec. 20, 1994), Franklin App. No. 94APA06-832, unreported. Here, the trial court commented from the bench that appellant was entitled to three hundred and thirty days of jail-time credit. (Tr. 823.) However, the judgment entry actually filed reflects that appellant was given zero days of jail-time credit.
The state first argues that the trial court has no duty to calculate jail-time credit, and the duty to grant jail-time credit is now vested solely with the Ohio Department of Rehabilitation and Correction. The state cites State v. Thorpe (June 30, 2000), Franklin App. No. 99AP-1180, unreported, for this proposition. However, in Thorpe, this court stated that jurisdiction to give jail-time credit after the initial sentencing date for credit for time served between sentencing and transportation to prison rested with the Ohio Department of Rehabilitation and Correction. This court did not reach the issue of pretrial detention, which is what appellant is arguing here. Instead, this court noted that, although the mandatory language of Crim.R. 32.2 has been abolished, trial courts are encouraged to continue the practice of calculating the number of days served prior to sentencing for the benefit of the Ohio Department of Rehabilitation and Correction which needs such information to fulfill its duty as set forth in R.C. 2967.191.
The state further argues that the trial court correctly calculated appellant's jail-time credit as zero because while awaiting trial he was serving time for an unrelated offense. See State v. Smith (1992),71 Ohio App.3d 302 (defendant is not entitled to jail-time credit for any period of incarceration arising from facts separate and apart from those on which current sentence is based). The transcript tends to support this position.
Appellant took the stand in his own defense at trial, and testified that, at the time of trial, he was in the midst of serving a five-year sentence for drug possession, unauthorized use of a motor vehicle, and a drug abuse case. Appellant stated that he started serving that sentence in 1997. Therefore, because it appears that appellant was incarcerated prior to his conviction in the instant offense on totally separate offenses, appellant may not have been entitled to any jail-time credit.
However, this court has previously held that a trial court errs when it issues a judgment entry imposing sentence on a defendant that differs from the sentence announced in the defendant's presence. State v. Tatum (Mar. 6, 2001), Franklin App. No. 99AP-1141, unreported (and cases cited therein). A defendant has the right to be present when sentence is imposed, including resentencing if the court determines that the sentence should be changed. State v. Jones (Mar. 18, 1999), Franklin App. No. 98AP-639, unreported. Therefore, we sustain appellant's fifth assignment of error insofar as it relates to the variance in sentencing. As such, the matter must be remanded for resentencing to clarify or correct the variance in sentencing.
In his sixth assignment of error, appellant contends that he received ineffective assistance of counsel according to the standards set forth in Strickland v. Washington (1984), 466 U.S. 668. In particular, appellant contends that his counsel was ineffective because he failed to interview witnesses or call fact witnesses (other than appellant), that he failed to call expert witnesses to rebut the state's experts, that he failed to object to opinion testimony offered by the state's experts, that he failed to request a jury instruction on manslaughter, that he failed to object to certain testimony, and that he failed to object to gruesome photographs of the victim.
In order to prevail on his claim of ineffective assistance of counsel under Strickland, appellant must show that "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." State v. Reynolds (1998), 80 Ohio St.3d 670,674. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, at 686. Thus, a two-part test is necessary to examine such claims. First, appellant must show that counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably. State v. Keith (1997), 79 Ohio St.3d 514, 534. Second, appellant must show that, but for the counsel's errors, there is a reasonable probability that the results of the trial would be different. Id.
The burden of showing ineffective assistance of counsel is on the defendant. State v. Smith (1985), 17 Ohio St.3d 98. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie (1998),81 Ohio St.3d 673, 675. Tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance. State v. Carter (1995), 72 Ohio St.3d 545, 558 ("[j]udicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel"); State v. Carpenter (1996),116 Ohio App.3d 615, 626 (court of appeals is to "presume that a broad range of choices, perhaps even disastrous ones, are made on the basis of tactical decisions and do not constitute ineffective assistance") Applying these standards, we find that appellant has failed to show that his counsel was ineffective.
Without going outside the record, we cannot make a determination concerning appellant's first two arguments concerning counsel's alleged failure to interview or call certain witnesses.
With regard to counsel's failure to object to expert testimony, appellant has failed to demonstrate how his counsel's failure to raise objections prejudiced his case. Appellant's theory at trial was that he had only met the victim on one occasion and was never in the apartment where she was killed. Appellant did not dispute that Ms. Banks was killed by a shotgun blast to the head. Thus, failure to object to expert testimony that the victim was killed at close range by a shotgun did not prejudice appellant's theory of the case. Moreover, because no fingerprints of appellant were found at the crime scene, appellant has failed to articulate how the fingerprint expert's testimony prejudiced his case.
Appellant has also argued that his counsel was ineffective for failing to request a jury instruction on voluntary manslaughter. It is well-settled law that voluntary manslaughter is an inferior degree of murder. State v. Tyler (1990), 50 Ohio St.3d 24, 36. The elements of voluntary manslaughter are contained within the offense of murder except for an additional mitigating element of provocation. Id. A defendant charged with murder is entitled to a jury instruction as to voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime and a conviction for voluntary manslaughter. Id. at 37. R.C. 2903.03(A) defines the offense of voluntary manslaughter as follows:
 No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *.
A defendant on trial for murder must show by a preponderance of the evidence that he or she acted under the influence of sudden passion or in a sudden fit of rage, brought on by the victim's serious provocation, in order to be convicted of voluntary manslaughter rather than murder. State v. Rhodes (1992), 63 Ohio St.3d 613, 619. Therefore, a defendant has the burden of producing evidence relating to the existence of a mitigating circumstance in order for the jury to consider voluntary manslaughter as an inferior-degree offense of aggravated murder. Rhodes, supra, at 617. In addition to the burden of production, a defendant also has the burden of persuasion, which means a defendant must establish the existence of a mitigating circumstance. Id.
In State v. Deem (1988), 40 Ohio St.3d 205, paragraph five of the syllabus, the court defined "serious provocation" as provocation that is "reasonably sufficient to bring on extreme stress and * * * reasonably sufficient to incite or to arouse the defendant into using deadly force." A reviewing court, in determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, "must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." Id. However, in determining whether provocation is reasonably sufficient, the court must first apply an objective standard by determining whether a reasonable trier of fact "would decide that an actor was reasonably provoked by the victim." State v. Shane (1992), 63 Ohio St.3d 630, 634. It is only when the objective standard is met that the Deem test of the "emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time" must be considered. Shane, supra, at 634.
There is a strong presumption that a trial counsel's failure to request an instruction on lesser-included offenses is a matter of trial strategy. See State v. Griffie (1996), 74 Ohio St.3d 332, 333. Here, appellant took the stand in his own defense and testified that he was not present and had only met the victim once previously. Defense counsel did argue at trial that the state's evidence was insufficient to prove prior calculation and design. It is reasonable trial strategy to argue that appellant did not kill the victim and the state did not meet its burden of proof on prior calculation and design. An instruction on voluntary manslaughter, however, would have been completely inconsistent with the defense theory of the case and forced appellant's counsel to argue both that his client did not commit the murder, but, if he did, he had been provoked into a sudden fit of rage by the victim. Under these circumstances, counsel's decision not to request a jury instruction on voluntary manslaughter that would conflict with the theory presented at trial was clearly a matter of reasonable trial strategy.
Appellant also argues that his trial counsel was ineffective for failing to object to the testimony of James Hutson. Mr. Hutson sometimes sold drugs for appellant and testified that appellant confessed to him that he had shot a person at the Greenbriar apartment complex. Two or three days later, after Mr. Hutson came up short with some money for appellant, appellant hit Mr. Hutson and told him to go in his bedroom "before I was in the floor in a cardiac arrest." (Tr. 497, 502.) Recalling appellant's prior statement that he had shot someone, Hutson climbed out his bedroom window and informed the police. Appellant asserts admission of this testimony without objection was plain error, but does not set forth the grounds for the objection. Appellant's statement that he had shot someone at Greenbriar was certainly relevant and clearly admissible under Evid.R. 801(D)(2), admission by a party opponent. Counsel is not ineffective in failing to object to admissible evidence. State v. Zimmerman (Sept. 1, 2000), Lucas App. No. L-98-1246, unreported.
Finally, appellant argues his trial counsel was ineffective for failing to object to the admission of gruesome photographs to the jury. The mere fact that photographs depict images which are disturbing or prejudicial to a defendant, is not sufficient to render the photographs inadmissible as a matter of law. State v. Coleman (1999), 85 Ohio St.3d 129, 137; State v. Biros (1997), 78 Ohio St.3d 426; State v. Whatley (Apr. 15, 1999), Franklin App. No. 98AP-589, unreported. Rather, the probative value of the photographic evidence must be weighed against the danger of unfair prejudice in order to reach a determination on the issue of admissibility. Id. See, also, Evid.R. 403.
Upon review of the photographic evidence and the events at trial, we find the photographs were illustrative of the state pathologist's testimony concerning the victim's fatal injuries suffered as a result of the shooting. Although unpleasant, they were not unduly gruesome, and we are unable to conclude that the photographs' probative value was substantially outweighed by the danger of unfair prejudice to the defendant. Accordingly, appellant's sixth assignment of error is not well-taken and is overruled.
In his seventh assignment of error, appellant argues the trial court erred in overruling defense counsel's objections to certain testimony and exhibits. The admission of the autopsy photographs has already been discussed in relation to the sixth assignment of error.
Appellant also argues the trial court erred in overruling an objection to James Hutson's testimony that he saw "pleasure" in appellant's eyes as appellant related that he had shot someone at the Greenbriar apartment complex. Appellant argues the characterization was without foundation and prejudicial to appellant. While the statement may have been prejudicial to appellant, it was not lacking in probative value as the demeanor of the declarant is relevant in assessing the truthfulness of the statement.
Finally, appellant argues the trial court erred in admitting a black bag and its contents that were recovered from the former apartment of appellant's former girlfriend, Candida Wilson. Ms. Wilson testified that she "guessed" that appellant had placed the black bag in her closet and that the bag sat in her closet for some time. Inside the bag were ski masks, gloves, electrical tape, handcuffs, loose shotgun shells, boxes of .45 caliber ammunition, brass knuckles, water bottles, binoculars, power cords, cassette tapes, and toiletries. Appellant's fingerprint was found on one ammunition box.
We agree with appellant that the probative value of the black bag was nonexistent. However, the error was harmless given the overwhelming admissible evidence of appellant's guilt. The seventh assignment of error is not well-taken and is overruled.
Based on the foregoing, appellant's assignments of error one, two, three, four, six, and seven are overruled, appellant's fifth assignment of error is sustained in part and rendered moot in part. Accordingly, we affirm the judgment of conviction of the Franklin County Court of Common Pleas, but reverse that portion of the judgment granting appellant zero days of jail-time credit. As such, this cause is remanded to the trial court for resentencing in accordance with this opinion.
 __________________ LAZARUS, J.
PETREE and DESHLER, JJ., concur.
[1] Presumably, "all three" refers to the two assistant prosecutors and the investigating detective who were sitting at counsel table for the state. (See Tr. at 4.)